WELLMAN ENGINEERING CO., PLAINTIFF-APPELLEE, *v.* CALDERON AUTOMATION, INC., DEFENDANT-APPELLANT.

Ohio Appeals, Eighth District, Cuyahoga County.

No. 26349. Decided January 2, 1964.

Messrs. *Jones, Day, Cockley & Reavis, Mr. Frank C. Heath* and *Mr. Thomas P. Mulligan,* for plaintiff-appellee.

Messrs. *Day, Cope, Ketterer, Raley & Wright, Mr. Clyde H. Wright* and *Mr. Robert P. Eshelman,* for defendant-appellant.

*Per Curiam.* Appeal is made to this court on questions of law and fact from a decree and judgment entered for the plaintiff in the Court of Common Pleas of Cuyahoga County. The action is one for injunction, accounting and other relief. The court below granted injunctive relief to plaintiff and also entered a judgment in favor of plaintiff and against defendant for the sum of $120,000.00 pursuant to certain conclusions of fact and law. Conclusion of law No. 7 as found by that court reads in part as follows:

"* * * Armco, Ford and Alliance are not parties to this lawsuit and it would not be practical to enjoin the completion of the present contracts pertaining to Alliance, Armco and Ford; and, in lieu of injunctive relief pertaining to said contracts, the Court ascertains and awards substitutional redress in money for the injury and damages already done, without prejudice to further claims of plaintiff for equitable relief and damages arising out of other or further breaches of the aforesaid Agreement, as amended, by the defendant, the aggregate sum of $120,000.00, for which judgment in favor of plaintiff and against the defendant is hereby rendered."

A stipulation of parties was entered into in this court on May 6, 1963, to the following effect:

"It is stipulated by and between the parties that, for the purpose of hearing and determining this cause on appeal on questions of law and fact, the evidence shall consist of the testimony given in the Common Pleas Court in this cause, as shown by pages 4 through 517 of the Transcript of the proceedings in the Common Pleas Court, all of which shall be subject to the objections of the respective parties, as shown by such Transcript.

"It is further stipulated and agreed between the parties that all motions made and exceptions taken in the course of the proceedings in the Common Pleas Court, as disclosed by the transcript of proceedings, shall be considered as having been made and renewed in this Court."

In its petition, Wellman Engineering Company, an Ohio corporation, sets out, inter alia, that on January 14, 1958, it entered into a written agreement with defendant, Calderon Automation, Inc., also an Ohio corporation, which granted to Wellman for valuable consideration as Licensee for a term of years ending January 1, 1975, the sole and exclusive right to manufacture certain equipment for charging iron or steel-making furnaces with scrap and that applications for United States Letters Patent for such equipment had been assigned to the defendant corporation. The inventor of these methods and equipment is Albert Calderon, the president and principal shareholder of Calderon Automation, Inc. This 1958 agreement replaced a 1954 agreement between Wellman and the predecessor to the rights of Calderon Automation, Inc. in the inventions and patent applications.

It is further alleged that in the 1958 License Agreement the parties further agreed as follows:

"Defendant Calderon will obtain from Wellman, and from no other source, equipment of the kind with which the agreement is concerned, except as thereinafter set forth.

"Defendant Calderon will keep plaintiff Wellman advised with respect to any inquiries from prospective purchasers of any of the equipment with which the Agreement is concerned.

"Defendant Calderon, in the event that it proposes to enter into a contract with a prospctive purchaser to sell and deliver any such equipment to such purchaser, shall inform plaintiff Wellman as to the requirements of the prospective purchaser

and the terms of any proposed agreement between defendant Calderon and the prospective purchaser.

"Plaintiff Wellman, on request, shall furnish to defendant Calderon a quotation of Wellman's price for manufacturing the equipment involved and the terms of payment. The estimated price is to be determined by taking Wellman's estimate of the cost of manufacturing the equipment (including the detailed engineering involved, the fabricating and assembling of the equipment, the erection thereof by Wellman or by a subcontractor and all work incidental thereto, which is the sum of material costs), plus Wellman's usual charges for labor and burden plus an item equal to 38 percent of labor and burden plus the cost, if any, of erection by a subcontractor, this sum to be divided by 85/100ths. The quoted price can be changed to reflect increases in material or labor costs, or burden, applied as set forth in the foregoing formula.

"Plaintiff Wellman is to inform defendant Calderon as to the probable time for completion of its engineering, manufacturing and erecting operations with respect to such equipment; defendant Calderon to make prompt delivery of layout drawings approved by the purchaser under any specific order.

"Defendant Calderon shall negotiate with a prospective purchaser with a view to obtaining a definite order for equipment involved at a price not less than the price quoted by plaintiff Wellman, and defendant Calderon and Wellman shall negotiate with respect to the detailed provisions of the contract between them respecting the proposed order.

"Plaintiff Wellman and defendant Calderon, realizing that Wellman cannot obligate itself to accept all orders from Calderon, and further realizing that numerous details in contracts between defendant Calderon and prospective purchasers, and in contracts between plaintiff Wellman and defendant Calderon, under the 1958 License Agreement will have to be arrived at by agreement in the light of the particular requirements of the prospective purchasers, and the then prevailing economic and other conditions, will negotiate with each other in good faith in order that they may each obtain the maximum amount of benefit from the inventions constituting the subject matter of the 1958 License Agreement and the business available. In the

event that they are unable to agree upon the terms and conditions of any proposed contract between them for the manufacture by plaintiff Wellman of any particular item of equipment for defendant Calderon, or if plaintiff Wellman should decline to accept an order from defendant Calderon for any particular item of equipment, defendant Calderon shall be free to obtain such item from any other manufacturer, provided that it shall pay plaintiff Wellman a royalty in the amount of five percent of the total price paid by defendant Calderon for such equipment, and provided that when the royalties so paid shall aggregate $33,000, no further royalty payments need be made.

"Before plaintiff Wellman begins to manufacture equipment ordered under the 1958 License Agreement, defendant Caldron is required to furnish plaintiff Wellman evidence satisfactory to it of receipt by defendant Calderon of an order from a prospective purchaser, defendant Calderon not being required, however, to inform plaintiff Wellman as to the price paid by the purchaser. Plaintiff Wellman, when so required by defendant Calderon, is to furnish defendant Calderon a complete set of drawings for approval by defendant Calderon.

"Upon completion of any equipment, plaintiff Wellman is to furnish defendant Calderon a complete set of drawings of the equipment.

"Defendant Calderon is required to assign to plaintiff Wellman payments to be made under any contract with a purchaser of equipment as security for the payments to become due from defendant Calderon to plaintiff Wellman, and purchaser is to make such payments direct to plaintiff Wellman.

"All equipment manufactured by plaintiff Wellman and delivered to defendant Calderon under the 1958 License Agreement is to bear a plate specifying clearly and legibly such name as defendant Calderon may designate for that purpose, and the plate may also state that the equipment was manufactured by plaintiff Wellman under license."

Allegation is made that following the 1954 and 1958 license agreements Wellman and Calderon Automation and its predecessor cooperated in the manufacture of such equipment for several customers and Wellman expended large sums of money for the development of such business; that in connection with all but one of these orders the purchasers required that the

orders be taken by Wellman and in quoting prices to each of these customers an amount was added to Wellman's estimate for Calderon's compensation or markup.

It is claimed that in May, 1962, request was made of Wellman and Calderon Automation to quote on Calderon equipment for Armco Steel Corporation. On or about May 18, 1962, Wellman and Calderon Automation reached an agreement covering the Armco job and other jobs providing certain terms between them; they negotiated concerning a proposal for the Armco job and had reached an agreement concerning all substantial questions at issue relating thereto between the parties when defendant Calderon, on or about June 22, 1962, arbitrarily refused to carry out its agreement with plaintiff.

Thereafter, it is alleged, Calderon Automation, acting in breach of its 1958 License Agreement with Wellman, procured Alliance Machine to submit a proposal for the Armco job embodying inventions licensed to Wellman. Such proposal was accepted and the equipment is being manufactured with Albert Calderon's help and with the effect of destroying the exclusive rights granted to Wellman.

Wellman sets out that Calderon Automation is presently participating in the procurement of contracts from other prospective purchasers, including Ford Motor Company, for the manufacture and sale of equipment embodying the inventions licensed exclusively to plaintiff Wellman by the 1958 License Agreement by manufacturers other than plaintiff Wellman; that defendant Calderon has failed to keep Wellman advised with respect to inquiries from prospective purchasers of equipment with which the 1958 License Agreement is concerned, and has failed and refused to request quoted prices from Wellman covering such inquries, or to consult or negotiate with Wellman concerning same; that defendant, through its president, Albert Calderon, has advised Wellman that it is not required to have Calderon equipment embodying the inventions covered by the 1958 License Agreement manufactured for it by Wellman and that it intends to have it manufactured by other manufacturers and that it will not deal with plaintiff Wellman; that Wellman has performed all of the things on its part to be performed under the agreement; that by reason of the foregoing Wellman has been and is being damaged in its business by loss of prospective

profits on the Armco job which it is difficult to ascertain and by impairment of its good will and reputation as the exclusive manufacturer of Calderon equipment; that plaintiff will, in the future, unless restrained by order of the court, be deprived, by the acts and conduct of defendant, of its rights conferred by the 1958 License Agreement and will be damaged in its business by defendant's failure to advise plaintiff of prospective purchasers and in other respects in amounts completely unascertainable at the present time; it is claimed that as a result plaintiff suffers irreparable injury and has no adequate remedy at law.

Defendant joins issue with four separate defenses set forth in its answer and also includes a counterclaim seeking to have the court declare the rights, duties and other legal relations of Wellman and Calderon Automation, if any, arising out of the agreement of January 14, 1958. Wellman replies to this pleading and answers the counterclaim.

Upon the evidence, as reflected by the testimony in the transcript of evidence and the various exhibits, we find the following facts:

Plaintiff, Wellman, is an Ohio corporation engaged in the manufacture of equipment for the steel industry and bulk material handling equipment for the steel industry. Defendant, Calderon Automation, Inc., is an Ohio corporation engaged in the business of designing equipment for handling steel mill material and particularly equipment for charging steel furnaces with scrap, and in connection therewith Calderon holds certain patents and patent applications.

On September 17, 1954, Wellman and Industrial Automation (predecessor of Calderon Automation, Inc.) entered into an agreement whereby Industrial granted to Wellman the sole and exclusive right and license to manufacture equipment useful in the handling of scrap metal and in charging open hearth furnaces.

The agreement of September 17, 1954, was superseded by an agreement dated January 14, 1958, between Wellman and Calderon Automation whereby Calderon granted to Wellman, as licensee, for a term ending January 1, 1975, the sole and exclusive right subject to terms and provisions contained therein

to manufacture equipment usued in charging iron and steel-making furnaces with scrap. This 1958 License Agreement is attached to Wellman's reply as Exhibit A.

This 1958 License Agreement was amended and supplemented by Wellman and Calderon Automation on May 18, 1962, by a written instrument which is attached to Wellman's reply as Exhibit B.

Pursuant to this 1958 License Agreement, and prior to 1962, Wellman did manufacture and deliver to customers in the steel industry three large and complete Calderon superchargers, as well as some smaller items of Calderon charging equipment. Wellman was in fact the only manufacturer of Calderon charging equipment in the United States.

Although the 1958 License Agreement contemplated that orders for charging equipment would be taken in the name of Calderon Automation, it developed that substantially all of the purchasers desired and required that the orders be taken by Wellman and accordingly, in such cases, the 1958 License Agreement was modified by mutual agreement between Wellman and Calderon Automation to permit such orders to be taken in Wellman's name.

In April, 1962, Wellman received an inquiry from Kaiser Engineers concerning the purchase of Calderon Automation scrap charging equipment on behalf of Armco, by whom Kaiser Engineers had been engaged to build a steel plant.

This inquiry from Kaiser Engineers led to discussions (a) between Wellman and Calderon Automation and representatives of Kaiser and Armco regarding the scope and nature of Armco's requirements and the terms of the proposed purchase order from Kaiser on behalf of Armco, and (b) between Wellman and Calderon Automation in respect to the terms of an agreement between them as contemplated by paragraph eight of the 1958 License Agreement.

From the commencement of these discussions on May 2, 1962, Calderon Automation, by the conduct and statements of Albert Calderon, its president and active representative in all such discussions, manifested an intent to act arbitrarily and to refuse to recognize the obligations imposed upon it by the 1958 License Agreement.

During the course of the discussions and negotiations between Wellman and Calderon Automation from May 2, 1962 to June 16, 1962, both inclusive, certain questions were discussed and resolved as follows:

(a) In whose name should the purchase order from the customer be taken? This was resolved by the Agreement of May 18, 1962, to provide that the purchase order would be taken in the name of Wellman or Calderon Automation, or jointly, according to the wishes of the customer.

(b) To whom should the customer pay the purchase price? This was resolved by the Agreement of May 18, 1962, to provide for payments by the customer to an escrow agent.

(c) On whose paper should the drawings be made? This was resolved by the Agreement of May 18, 1962, providing that all drawings would be on Calderon Automation paper.

(d) How should responsibility for the product be divided? This was resolved by the Agreement of May 18, 1962, to provide that responsibility for the method and system would be that of Calderon Automation and responsibility for design, engineering, workmanship and materials would be Wellman's.

(e) What should be the price of the equipment to Kaiser for the Armco job? This was resolved on June 13, 1962, when Wellman and Calderon Automation agreed that the sales price to the customer would be $544,830.00, of which $82,000.00 would be paid to Calderon Automation as its fee and the balance would be paid to Wellman as a fixed price for engineering and manufacturing the equipment.

It is to be noted with respect to sub-paragraph (e) above, that the discussion and agreement were not required because the method for determining price was set forth in the 1958 License Agreement, as amended, and hence price was not a question concerning which the parties were required to negotiate with respect to the equipmnt for Kaiser Engineering in connection with the Armco job.

As a consequence of the resolution of the five questions enumerated in the sub-paragraphs above, there were no unsettled issues between Wellman and Caldron Automation as of June 16, 1962, and, accordingly, Wellman was justified in completing and forwarding a quotation to Kaiser on that date.

Kaiser Engineering had requested submission of the quotation by Wellman and the quotation was already overdue.

Subsequent to June 16 and through June 22, 1962, Calderon Automation submitted additional demands which were agreed to by Wellman, or otherwise handled, as follows:

(a) Express designation in the quotation of National City Bank of Cleveland as escrow agent with change of escrow agent to be made only by joint instructions from Wellman and Calderon Automation.

(b) Calderon Automation to have the right, at reasonable times and upon reasonable notice to Wellman, to inspect the progress of the work in Wellman's shop.

(c) A full set of reproducible drawings to be delivered to Calderon Automation when the equipment has been accepted by the customer.

(d) Equipment was to be labeled as provided in Section 14 of the License Agreement of January 14, 1958.

(e) Calderon Automation to be furnished copies of drawings during the progress of the work. Wellman agreed to this request to the extent that Calderon Automation would receive, during the design and construction phase, copies of drawings of the Armco equipment insofar as they related to Calderon's areas of responsibility for the equipment.

Wellman agreed to the requests noted in sub-paragraphs (d) and (e) above although they were not required to negotiate with Calderon Automation with respect thereto because the subject of labels and the subject of furnishing drawings were expressly covered by the 1958 License Agreement, as amended.

All issues appropriate for negotiation had been agreed to by Wellman and Calderon Automation as of June 22, 1962, and prior to the termination of relations by Calderon Automation with Wellman. Then, on June 22, 1962, Calderon Automation arbitrarily and without good cause terminated relations with Wellman and refused to perform its obligations under the 1958 License Agreement, as amended. The record reflects that at all time prior to Calderon Automation's termination, Wellman acted in good faith in its relations with Calderon. Subsequent to June 22, 1962, Calderon Automation persisted in refusing to perform its obligations under the 1958 License Agreement, as amended, although Wellman was at all times ready and

anxious to perform its obligations under said License Agreement. Calderon Automation's complaints and claims that Wellman has breached the agreement between the parties are captious and without real substance.

Although Wellman continued negotiations with Kaiser concerning the Armco job, Calderon Automation injected itself into the relations between Wellman and Kaiser in such manner as to cause Kaiser Engineering to decline to award the Armco job to Wellman. Except for such interference on the part of Calderon Automation, Kaiser Engineering would probably have awarded the Armco job to Wellman.

Subsequent to July 19, 1962, and as a direct result of the activities of Calderon Automation, the contract for the building of the Armco equipment was awarded by Kaiser Engineering to Alliance Machine Company and in connection with this award Calderon Automation agreed to license Alliance Machine Company to manufacture the equipment and agreed to license Armco to use the equipment so built.

Although Calderon Automation had agreed to accept $82,-000.00 as its fee for the Armco job if the equipment was manufactured by Wellman, Calderon Automation will receive $202,-000.00 for its fee for the manufacture by Alliance Machine of the equipment for Armco. Wellman would probably have made a profit of at least $60,000.00, if it had been permitted to manufacture the equipment for Armco.

Calderon Automation had engaged in discussions with and submitted quotations to Ford Motor Company as early as April 2, 1962, regarding Ford's interest in purchasing Calderon Automation equipment, without notifying Wellman or permitting Wellman to participate therein. Calderon Automation authorized Ford to seek competitive bids for the manufacture of Calderon Automation charging equipment and to award a contract for said equipment to the lowest bidder, notwithstanding Wellman's exclusive rights subject to the terms and provisions of and under the 1958 License Agreement, as amended.

Disregarding Wellman's requests, Calderon Automation failed and refused to give Wellman information needed by Wellman in order to submit a quotation to Ford, and Calderon Automation arbitrarily and without just cause refused to discuss the

Ford job with Wellman. As a result of this course of conduct by Calderon Automation, Ford awarded a contract to Alliance Machine for the Manufacture of Calderon Automation charging equipment and as its share of profit will acquire $143,500.00.

Kaiser Engineering, Alliance and Ford entered into these latter contracts with full knowledge of the terms of the 1958 License Agreement between Wellman and Calderon Automation and of Wellman's claims thereunder.

Subsequent to June 22, 1962, Calderon Automation made copies of drawings which had been prepared by Wellman for prior jobs and which contained the legend "Property of Wellman Engineering Company" and gave such copies to Alliance with a new legend thereon reading, "Property of Calderon Automation, Inc."

From the evidence it appears that there will in all probability be an increasingly large demand by the steel industry in this country for Calderon Automation charging equipment. It also appears therefrom that Wellman's prices for the construction of Calderon Automation charging equipment were not excessive and its workmanship in connection with such construction was good. It appears further that Wellman has up to the time of the filing of this lawsuit been known throughout the steel industry in this country as the builder of Calderon Automation charging equipment and has a very good reputation as a manufacturer of such equipment. The arbitrary and unwarranted conduct of Calderon in permitting Alliance Machine to be awarded the Armco job has damaged Wellman and Calderon Automation has not acted in good faith with Wellman in regard to the Armco proposal and transaction.

After a careful review and lengthy consideration of all of the evidence, we conclude and hold that the 1958 License Agreement, as amended, is a valid and binding agreement between Calderon Automation and Wellman and is not void for indefiniteness, and further, it is not impossible of performance. Wellman and Calderon Automation are not required to negotiate with each other respecting those matters which have been specifically provided for in the 1958 License Agreement, as amended. Under this agreement, also, Calderon has no right to require that Wellman submit to competitive bidding, irre-

spective of the fact that a particular prospective customer requests competitive bids.

As of the dates of June 16, 1962, and June 22, 1962, there were no unresolved issues between Wellman and Calderon Automation respecting the Armco job that were appropriate for negotiation under the 1958 License Agreement, as amended. The termination by Calderon Automation of relations with Wellman on June 22, 1962, was arbitrary and without justification and constituted a breach of its obligations under said License Agreement, as amended. This breach is not excusable under the provisions of paragraph ten of said Agreement. If, after acting in good faith and with reason, (1) the parties hereto are unable to agree on terms and conditions of any proposed contract between the parties hereto for the manufacture by Wellman of any item of equipment for Calderon or (2) for reasons deemed sufficient by Wellman, it shall decline to accept an order from Calderon Automation for a particular item of equipment, Calderon Automation shall be free to obtain said item from any other manufacturer. Such is the language and meaning of paragraph ten of said Agreement. In such event, Calderon Automation shall pay Wellman five percent of the price paid until the aggregate sum of $33,000.00 is reached. This provision is applicable only to purchases of equipment by Calderon Automation under the aforesaid provisions (1 and 2) of paragraph ten and is not applicable to any other purchase of equipment or to any other contract not covered by said provisions (1 and 2).

The transcript of evidence reflects that Wellman has acted in good faith with Calderon Automation at all times in the period of this contract and Wellman has not breached said contract either before or after its amendment on May 18, 1962. Calderon Automation has not acted in good faith with respect to the Armco and Ford proposals and transactions. The Armco and Ford proposals and transactions do not come within the scope of the aforesaid provisions (1 and 2) of paragraph ten.

This court finds that Wellman has no adequate remedy at law and is entitled to a permanent injunction enjoining and directing Calderon Automation as prayed for in Wellman's petition herein and particularly (a) directing Calderon Auto-

mation to perform its obligations under the 1958 License Agreement, as amended, and (b) enjoining Calderon Automation from licensing other manufacturers or purchasers of equipment contrary to Calderon Automation's obligations under the 1958 License Agreement, as amended, and such is our decree.

The only evidence in the entire record in regard to damages to Wellman is contained in the following questions to and answers of the witness, Mr. James D. Lightbody, vice president of operations with Wellman. He is a mechanical engineer by profession since 1940. He had testified regarding the proposal of June 14, 1962, for Calderon charging equipment for the Armco job which was sent to Kaiser Engineers. This proposal is in the record as plaintiff's Exhibit No. 11 and the price quoted therein was $544,830.00. The questions were addressed to Mr. Lightbody by counsel for Wellman as follows:

"Q. Now can you state to the Court whether or not you had familiarity with the components from Wellman's point of view that went in to make up the figure that constitute the quotation?

"A. I had general knowledge, yes.

"Q. And—excuse me. Are you finished?

"A. I would not know all of the specifics.

"Q. Were you familiar with the work involved in engineering and constructing and erecting the piece of machinery called for by that quotation?

"A. Yes.

"Q. Based on your knowledge of the components that went into the figures and your knowledge of the job of engineering and building this piece of equipment, do you have an opinion as to the probable profit to Wellman would have been had Wellman secured the purchase order for the construction of this piece of equipment?

"MR. CLARKE: Object.

"THE COURT: He may answer.

"A. It would have been at least $60,000.00."

There is not another fragment of testimony on damages, either supportive or contradictory. In a cause of action to account for damages for breach of contract, compensatory damages are recoverable. They are such damages as arise naturally from the breach of the contract, or such as may reasonably be

supposed to have been in the contemplation of the parties, at the time they made the contract as the probable result of the breach. Substitutional redress, referred to by the court below, is not a proper measure or basis of damages in this case. The measure of damages applicable to the facts in this case is the profit Wellman would have realized had the contract here been fully performed, which was prevented by defendant's breach.

In such a case, plaintiff has the burden of alleging and proving not only (a) what it would have received from the performance so prevented, but also (b) what such performance would have cost it (or the value to it of relief therefrom). Unless it proves both of these facts, it cannot recover as damages the profits it would have earned from full performance of the contract. *Allen, Heaton & McDonald, Inc.*, v. *Castle Farm Amusement Co.*, 151 Ohio St., 522, 86 N. E. (2d), 782; *United States* v. *Behan*, 110 U. S., 338, 28 L. Ed., 168, 4 S. Ct., 81; *Walton School of Commerce* v. *Stroud*, 248 Mich., 85, 226 N. W., 883. See Williston on Contracts, Volume Five (Rev. Ed.), 3765, Section 1339.

Therefore, under the evidence in this case the price to be paid to Calderon Automation by Armco was $544,830.00, which price included the markup or royalty fee to be paid to Calderon Automation in the sum of $82,000.00. Mr. Lightbody's testimony was that Wellman's profit would be at least $60,000.00, so it is clear that the performance would have cost Wellman $544,830.00, less the royalty fee of $82,000.00 to Calderon Automation, less the probable profit of $60,000.00 testified to by Mr. Lightbody.

There is no conjecture, speculation or uncertainty in connection with this part of the testimony. There is nothing contingent as to probable profits. The witness was of the opinion such profits would be at least $60,000.00. There is no reason why this figure should not be accepted, and, accordingly, our finding is that the plaintiff suffered damage in connection with the Armco job; and we further find that plaintiff is entitled to $60,000.00 from defendant as compensatory damages therefor, and judgment will be entered in that sum against defendant.

Defendant's motion for a directed verdict for the defendant is overruled. On the cross-petition of defendant and the answer thereto the decree is for the plaintiff.

Court costs are assessed against defendant and judgment for costs is hereby rendered against defendant.

A journal entry will be prepared in accordance with this opinion.

Exceptions.

SILBERT and CORRIGAN, JJ., concur.
(HURD, P. J., not participating.)