**TRANS UNION CREDIT INFORMATION CO.,**
**Plaintiff-Appellee,**

v.

**ASSOCIATED CREDIT SERVICES, INC., et al., Defendants-Appellants.**

**No. 86–3431.**

United States Court of Appeals, Sixth Circuit.

Argued Sept. 26, 1986.

Decided Nov. 12, 1986.

Roger L. Longtin (argued), James D. Adducci, Chicago, Ill., Frederick J. McGavran, Cincinnati, Ohio, for plaintiff-appellee.

Lawrence D. Walker (argued), Raymond W. Lembke, Taft, Stettinius & Hollister, J. Vincent Aug, Cincinnati, Ohio, for defendants-appellants.

Before KEITH and KENNEDY, Circuit Judges, and BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

In this diversity case, defendants-appellants Associated Credit Services, Inc. (ACS) and Credit Bureau of Cincinnati, Inc. (CBC) appeal a judgment of the United States District Court for the Southern District of Ohio which ordered specific performance of a service agreement executed by plaintiff-appellee Trans Union Credit Information Co. (TUC) and CBC.[1] Appellants now contend that the district court erred by (1) not finding that TUC had previously repudiated the service agreement, (2) excluding evidence of such repudiation and (3) abusing its discretion by ordering specific performance. For reasons discussed below, we affirm, but remand the case with instructions that the district court expressly enumerate the obligations of each party under the order.

TUC provides electronic data processing services and credit reporting through its national computer network, "Cronus." Like its competitor ACS, TUC owns local credit bureaus and has contracts with others. CBC is the major, local credit bureau in Cincinnati and the surrounding area, controlling nearly 95% of the market share. In the spring of 1985, TUC began negotiations with CBC for the exchange (sale and purchase) of credit reporting services under the "Cronus" system. As a result, TUC indefinitely postponed a plan to develop its own file of credit information on persons living in the Cincinnati area and to open an office in Cincinnati to compete with CBC.

On September 11, 1985, CBC and TUC reached an agreement and executed a service contract, the pertinent terms of which stated that each of the two parties would provide to the other unrestricted access to its computer file of credit information at one of two prices set forth in the service agreement.[2]

Originally, the service agreement had a five-year term with successive five-year renewals, but the parties later executed an addendum which provided that the agreement be terminable after three years upon six months prior notice if all of CBC's stock or assets were sold.[3]

Only two weeks after the execution of the service agreement, ACS, which had previously done business with CBC, made an offer to purchase all outstanding shares of CBC for twelve (12) million dollars. (ACS had made prior offers to purchase the stock for prices 3½ to 4½ million dollars less than the 12 million dollar price it now offered.) Fearing interference with CBC's performance of the service agreement, TUC filed an action to enjoin the sale, for specific performance of the service contract and for damages for tortious interference. TUC sought an immediate court order restraining the sale, but was unsuccessful.[4] The next day, the sale of the CBC stock to CSC[5] (i.e., ACS's parent company) was closed.

TUC based its contention that there was an anticipatory breach by CBC on the alleged fact that representatives of both CBC and ACS refused to give assurance to TUC of continued performance of the service

---

1. The court also held that Computer Sciences Corporation (CSC), parent company of ACS, was liable for damages for tortious interference with the contract, notwithstanding the fact that CSC was not a named defendant in the suit. However, this determination is not before us on appeal.

2. The agreement also provided that CBC would purchase data processing services from TUC for the entire term of the service agreement; that TUC would process CBC's file of credit information exclusively for CBC with the file remaining owned by CBC; and that CBC would purchase or lease equipment from TUC.

3. CBC states in its brief that its board of directors "believed that the marketability and, therefore, the prices of CBC's shares would be enhanced" if the service agreement could be terminable in three years instead of five.

4. The court determined, from statements of their counsel, that neither defendant intended to breach the service agreement, to dissolve CBC or to dispose of CBC's assets.

5. CSC was, in fact, the actual purchaser because of tax advantages, but all the parties in the present dispute acknowledge that ACS was, in substance, the buyer.

agreement. To substantiate its claim for the remedy of specific performance, TUC asserted that the opportunity given TUC by the service agreement to use CBC's credit information was unique and impossible to value monetarily.

After CBC and ACS failed to give TUC a "test tape," which was necessary to transfer CBC's database of credit information to TUC's computer system, TUC renewed its motion for preliminary injunctive relief. Meanwhile, CBC, on January 3, 1986, sent a letter to TUC formally terminating the service agreement.

Soon after, the district court entered a preliminary injunction mandating that the test tape be delivered to TUC. ACS and CBC filed a notice to appeal the preliminary injunction. The parties then reached a compromise in which they agreed to have the injunction dissolved, the notice of appeal withdrawn and to try the issues regarding the service agreement's validity, whether CBC had breached the agreement and whether specific performance was appropriate.

The district court concluded that the service agreement had not been repudiated and that the January 3rd letter to TUC constituted the breach. Without providing much detail, the court then decreed that TUC was entitled to specific performance. This decree had been partially stayed by agreement of the parties pending resolution of this appeal.

**I**

A. *Repudiation*

CBC contends that TUC repudiated the service agreement prior to CBC's January 3rd letter of cancellation, thus asserting that the letter could not have been a wrongful breach. In support of this contention, CBC claims that TUC both insisted that it (TUC) had *no* obligation to purge CBC's database on the contract's termination despite contrary language in the service agreement and refused to honor the material term governing the price of credit reports sold. Such repudiation, according

to CBC, principally occurred at an October 31, 1985 meeting, during which representatives of CBC, ACS and TUC discussed the performance of the service agreement.

However, at the injunction hearings held after October of 1985, counsel for CBC and ACS never contended that TUC had repudiated the service agreement. Moreover, the January 3rd letter, in which CBC attempted to cancel the agreement, never referred to any such repudiation as a basis for the cancellation. (In fact, the letter contains *no* explanation for the cancellation.) Surely, had such repudiation actually occurred on October 31, CBC and/or ACS would have so mentioned in subsequent judicial proceedings or in the January 3rd letter to provide a basis for the cancellation.

Further, as the district court noted, TUC indeed stated that it would purge CBC's database upon termination of the service agreement, thus acknowledging its obligation under the contract to that effect.

■ Section 6.02 of the service agreement provides that the price for the credit reports would be either $1.10 per report or an alternative formula price. CBC contends that TUC breached a subsequent verbal agreement to use only the $1.10 price. While it may be true that TUC's president initially indicated that he would not sell at either of the two prices if CBC was obtaining credit records for its owner ACS, but would sell if CBC was brokering the information to ordinary customers, such a refusal does not constitute a repudiation since TUC interpreted the service agreement as covering only sales to CBC's ordinary customers. *See American Hospital Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589, 600 (7th Cir.1986) (no repudiation because of difference in contractual interpretation). It appears that TUC's interpretation was made in good faith in the absence of any indication of malicious motive. *See Pacific Coast Engineering Co. v. Merritt-Chapman & Scott Corp.*, 411 F.2d 889, 894 (9th Cir.1969) (If the party's offer to perform the contract in accordance with his interpretation "appears to be made in the good faith belief that [his] interpretation is

correct, that will be evidence of his continued adherence to the agreement."). Moreover, TUC's president did specifically represent in response to questions by the district court that he would sell the credit reports under one of the two prices. Thus, in view of the foregoing considerations, we believe that the district court's finding of no repudiation was not clearly erroneous. Fed.R. Civ.P. 52(a) ("Findings of fact ... shall not be set aside unless clearly erroneous....").

### B. *Fed.R.Evid. 408*

CBC alleges that the district court wrongly excluded evidence under Fed.R. Evid. 408 of TUC's oral repudiation of the service agreement during a meeting between the parties on October 31, 1985, by incorrectly determining that the statements made at the meeting were made in settlement discussions. Rule 408 provides in pertinent part:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

■ CBC correctly states that Rule 408 excludes only evidence of conduct and statements made solely as part of the settlement negotiations, and not statements and conduct made at the meeting which are unrelated to such compromise negotiations. *See, e.g., Mendelovitz v. Adoph Coors Co.,* 693 F.2d 570, 580 (5th Cir.1982); *Thomas v. Resort Health Related Facility,* 539 F.Supp. 630, 637–38 (E.D.N.Y.1982). Yet, statements made by TUC's president at the October 31 meeting appear to have been made in settlement negotiations. Simply put, as CBC's own evidence expressly indicates, the meeting was designed "to get together and talk about our interpretation of the contract, and their interpretation of the contract, how the two of us would proceed." In light of the fact that TUC had already filed the present action, discussions of "how the two [parties] would proceed" appear to be settlement talks. Furthermore, the parties' counsel had apparently agreed that the discussions in the meeting would not be later used for any purpose, therefore indicating their belief that the discussions were indeed settlement negotiations.

■ Since the district court's determination that the proffered evidence of statements made were in fact statements made in settlement or compromise negotiations is not clearly erroneous, we conclude that the court did not commit error in the exclusion of the evidence pursuant to Rule 408. Fed.R.Civ.P. 52(a).

## II

### A. *Specific Performance*

■ In the present case, there is evidence of record providing grounds for the specific performance award under governing Ohio law which allows the equitable award where there is no adequate remedy at law. *State ex rel. Curd v. Backhaus,* 56 Ohio App.2d 79, 82, 381 N.E.2d 646, 648–49 (1977). Given the monopolistic position CBC has in the Cincinnati market, it and it alone has not only all of the individual credit reports for the area (which admittedly TUC may obtain outside the service agreement through procedures prescribed by the credit reporting trade association), but also updated credit inquiry data and pertinent historical information unavailable elsewhere. In addition, the synergetic loss, namely the loss of goodwill and exposure that TUC would have otherwise enjoyed as a result of the undeterminable increase of business with credit grantors and other credit bureaus across the nation during the term of the service agreement as well as the consequent increased recognition and business for TUC after the contract's term expires, certainly does not easily lend itself to a damages calculation.

In light of the uniqueness of the value to TUC of CBC's database and the corre-

sponding inadequacy of any remedy at law to compensate for the loss of this database, we conclude that the trial court did not abuse its discretion in granting specific performance.[6] Furthermore, it is clear that Ohio courts have not limited specific performance awards to cases involving land sales contracts. *See, e.g., Stephan's Machine & Tool, Inc., v. D & H Machinery Consultants, Inc.,* 65 Ohio App.2d 197, 205, 417 N.E.2d 579, 583 (1979) (contract for delivery of unique, heavy-duty machine); *Smythe v. Prescott, Merrill, Turben & Co.,* 21 Ohio Misc. 154, 252 N.E.2d 524, 527 (Ohio Com.Pl.1969) (contract to exchange corporate stock); *Wellman Engineering Co. v. Calderon Automation, Inc.,* 29 Ohio O.O.2d 95, 102, 195 N.E.2d 568, 576 (Ohio App.1964) (licensing agreement giving licensee exclusive right to manufacture equipment for charging iron or steel-making furnaces with scrap).

CBC argues that the specific performance order was improper because it compelled long continuing performance between two highly adversarial parties. However, as we understand it, TUC's access to CBC's database could be, with the push of some computer keys, instantaneous. Also, we have difficulty comprehending how the exchange of credit information under the service agreement would necessarily be more hostile than the exchange of reports under normal credit reporting trade association guidelines by which the parties would otherwise abide. Moreover, since ACS seems to have been completely apprised of CBC's contract with TUC before it (ACS) offered to purchase CBC's stock, disallowance of specific performance on the ground that it would be unfair to force competitors to cooperate in performance of the contract itself seems inequitable, especially since it appears that ACS obtained CBC in part to avoid such performance.

CBC also asserts that the absence of absolute clarity in a few of the terms of the service agreement prohibits an award of specific performance, but under Ohio law, this contention simply is not so. *Mr. Mark Corp. v. Rush, Inc.,* 11 Ohio App.3d 167, 172, 464 N.E.2d 586, 591 (1983) (specific performance awarded even though all contractual terms are not unambiguously stated).

 In addition, CBC claims that the district court made no express finding or conclusion which sets forth the basis for a specific performance decree. But the court's cursory findings of fact and conclusions of law may not automatically call for reversal and remand. As this court has held in *Huard-Steinheiser Inc. v. Henry,* 280 F.2d 79, 84 (6th Cir.1960), the failure of one district court to put on record findings of fact and conclusions of law which expressly support the equitable nature of its order does not require this court to reverse and remand if the "record discloses clearly without necessity of finding the basis upon which [the equitable order] rested." *Id.*[7] Thus, although contrary authority exists, this court does have a sound basis on which to hold that the district court's imprecise findings and conclusions do not vitiate the district court's judgment, the validity of which is supported by the evidence.

## B. *Specificity of the Decree*

 In its explanation of the acts to be performed under its decree of specific performance, the district court merely directed the parties to comply with the terms of the service agreement. Without more detail, this direction contravenes Fed.R.Civ.P. 65(d) which provides in part:

> Every order granting an injunction and every restraining order *shall ... be specific in terms;* shall describe in reasonable detail, and not by reference to the complaint or *other document,* the act or acts to be restrained....

(Emphasis Added.)

The curt reference to the service agreement's terms is all the more problematic in view of the relations of the parties and the consequent likelihood that they will differ

---

**6.** The parties agree that "abuse of discretion" is the standard to be applied.

**7.** The rationale of this point stems from the absence of any prejudicial error.

in interpreting some of the contractual terms.

Given the severity of the decree and the probability of conflicting interpretations of various provisions in the service agreement, we therefore remand to the district court with instructions that the court expressly enumerate the obligations each party has under the decree.