RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0062p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNION HOME MORTGAGE CORPORATION,

                *Plaintiff-Appellee*,

   *v*.

ERIK CROMER; HOMESIDE FINANCIAL, LLC,

                *Defendants-Appellants*.

No. 21-3492

─────────────

Appeal from the United States District Court for the Northern District of Ohio at Youngstown.
No. 4:21-cv-00385—Benita Y. Pearson, District Judge.

Decided and Filed: April 6, 2022

Before: GUY, THAPAR, and READLER, Circuit Judges.

─────────────

**COUNSEL**

─────────────

**ON BRIEF:** David K. Stein, Jonathan N. Olivito, TAFT STETTINIUS & HOLLISTER LLP, Columbus, Ohio, for Appellants. Jason T. Clagg, BARNES & THORNBURG LLP, Fort Wayne, Indiana, Paul N. Garinger, BARNES & THORNBURG LLP, Columbus, Ohio, for Appellee.

─────────────

**OPINION**

─────────────

RALPH B. GUY, JR., Circuit Judge. Defendant Erik Cromer was formerly a "managing loan officer" for plaintiff Union Home Mortgage. He agreed to several restrictive covenants, including that he would "not become employed in the same or similar capacity" with a competitive entity. Cromer left Union Home and started working for defendant Homeside Financial as a "non-producing" branch manager. It was not long before Union Home brought

suit and sought a preliminary injunction to enforce Cromer's restrictive covenants.  The district court issued an injunction—without any time limitation—prohibiting Cromer, and anyone acting in concert, from *inter alia* "competing with Union Home."  Defendants argue that the injunction fails to satisfy the specificity requirements of Federal Rule of Civil Procedure 65(d)(1), is overbroad, and was otherwise improperly granted under the standard for preliminary injunctions.  Because we agree, we VACATE the injunction and REMAND.

## I.

## A.

Homeside and Union Home both provide homeowners and prospective home buyers with mortgage and refinance loan services in and around Youngstown, Ohio.  Beginning in 2005, Cromer worked for Union Home as a loan officer in the company's branch office in Youngstown.  Cromer worked with two other loan officers, Jerry Latronica (beginning in 2016) and James Boots (beginning in 2019).  On March 22, 2019, Cromer accepted a position as "a team leader/managing loan officer" in the Youngstown branch office.  In that capacity, his "primary responsibility was to originate loans for Union Home," and he was compensated "solely" on a commission basis.  In accepting that position, Cromer and Union Home signed a two-page employee agreement (Agreement), governed by Ohio law.  Three provisions are pertinent.

First, under the "Restrictive Covenants" provision, Cromer made various promises.  Cromer agreed that for roughly three years and six months—until October 1, 2022—he "will not become employed in the same or similar capacity as [he] was employed with [Union Home] by . . . any entity that competes with [Union Home] in the home mortgage banking or brokering business" within "a one hundred (100) mile radius from either [Union Home]'s headquarters or any branch office . . . to which [Cromer] [i]s assigned."  In the same provision, Cromer also agreed that for about four years and six months—until October 1, 2023—he "shall not employ or seek to employ any person who is employed by [Union Home] or otherwise directly or indirectly induce such person . . . to leave his/her employment."

Second, under the "Confidential Information" provision, Cromer promised that he would not "use any Confidential Information for any purpose other than on behalf of [Union Home]," or "disclose" such information to "any third party"—"for any purpose whatsoever." The prohibition covered any "trade secrets" or "confidential" information that either: (1) "relates to or concerns the Company's business" and is "known by [Cromer] as a result of his . . . employment" (but is not otherwise "generally known"); or (2) is "specifically designated as proprietary and/or confidential by [Union Home]'s customers or other business partners."

Third, under the "Extension" provision, Cromer agreed that if he violated a covenant, then the term of the covenants would be "automatically" extended for a period of one year "after the later of (a) the date on which [he] ceases such violation; or (b) the date of the entry by a court . . . of any order or judgment enforcing such covenant."

About seven months later, on October 13, 2020, Cromer first contacted Homeside via email. He asked if Homeside was "exploring any opportunity to . . . expand [its] presence in Ohio" because, as Cromer explained, "I am looking to move me and my team within an aggressively short amount of time." The next day, he talked with Homeside's VP of Business Development, Heather Mitchell, and the company's Co-Founder and Managing Partner, Chris Miller. Cromer followed up with an email to Mitchell, informing her that he "may be in an employment agreement" and asking if this would "prevent [him] from moving" or if it is "something [Mitchell] deal[s] with often." Mitchell responded, "We deal with this often," punctuated with a smiley face.

Cromer then sent his Union Home Agreement to Miller on October 15. That same day, Cromer and Mitchell coordinated a call for Cromer's "entire team."

On October 16, a realtor sent a purchase contract to Cromer, Cromer forwarded that email to his personal email account, and then he forwarded the email to Homeside's VP of Transition & Corporate Development, Julia Brown. Cromer confirmed that the customer was his buyer and that "[w]e're ready to go on this one." He then worked with a Homeside loan officer to set up the customer's Homeside file. In emails to two Homeside loan officers, Cromer sent

the customer's W-2s, bank statements, driver's license, and home insurance quote, as well as tax information for the property and the purchase contract.

On October 21, Cromer sent an email from his Union Home email account to his personal email account with the subject line "Preapproval List," and attached a spreadsheet titled "PA GP Pipeline 2020" containing notes and the contact information for forty-six customers.

On October 26, Cromer sent a second customer's purchase contract to Homeside.  On October 27, he sent a third customer's purchase contract to Homeside, along with the customer's personal documents (e.g., driver's license, W-2s, paystubs, and tax returns).

In an October 26 email, Mitchell asked Cromer to provide his team members' contact information and compensation so that she could "get their [Homeside] offers out."  The next day, Cromer sent an email to Mitchell, specifying revisions for his contract and the contracts of Boots and Latronica.  In part, Cromer stated that his contract "should reflect" that he is "covered by a non-compete" and that Homeside will defend and indemnify him in any action involving Union Home's "non-compete/non-solicitation."

After Latronica and Boots resigned from Union Home on about October 30, 2020, and November 18, 2020, respectively, they began working for Homeside.  Meanwhile, Cromer met with Union Home's senior leadership and discussed his dissatisfaction.  At the end of the meeting, Cromer was escorted out of the building and blocked from accessing the Union Home email and telephone system.  At that point, Cromer believed that Union Home had terminated his employment.  After unsuccessfully attempting to negotiate a release from the restrictive covenants, Cromer sent a letter to Union Home on November 23, 2020, confirming that he was no longer employed by Union Home.

In early January 2021, Cromer and Homeside signed an employment contract for Cromer to work as a "non-producing" "manager" of Homeside's branch office in Youngstown, Ohio.  According to that contract, Cromer is required to "devote one hundred percent (100%) of [his]

working hours" to performing a nonexhaustive list of "managerial functions."[1]   He is paid a salary, with the possibility of a bonus.

Between November 2020 and February 2021, there is documentary evidence that Cromer had some limited, direct contact with customers and realtors as a Homeside branch manager, working in conjunction with a Homeside loan officer (Latronica) to process loan applications and send customers pre-approval letters and purchase contracts.

B.

Union Home sued Cromer and Homeside on February 18, 2021.  Union Home asserted seven claims against Cromer for allegedly violating:  the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq.*; the Ohio Uniform Trade Secrets Act, Ohio Rev. Code § 1333.61 *et seq.*; the noncompete covenant; the nonsolicitation covenant; the contractual duty of loyalty; the common law duty of loyalty; and the confidentiality covenant.  Union Home alleged only two claims against Homeside: tortious interference with business relationships and tortious interference with contract.  Union Home simultaneously moved for a preliminary injunction "to enjoin Cromer from: (1) *competing in violation of the non-compete covenant in the Employee Agreement*; (2) soliciting Union Home's employees; and (3) using or disclosing Union Home's confidential information for their or Homeside's competitive benefit."  (Emphasis added).

After some discovery, followed by witness testimony at a hearing on the motion for a preliminary injunction, the district court granted the injunction.  The court ordered that:

> Cromer and anyone in active concert or participation with Cromer, including Defendant Homeside Financial, LLC, is enjoined from: (1) *competing with Union Home* within 100 miles of the office in which Cromer worked; (2) soliciting Union Home's employees; and, (3) using or disclosing Union Home's confidential information for their or Homeside's competitive benefit.

*Union Home Mortg. Corp. v. Cromer*, No. 21-cv-0385, 2021 WL 1601193, at *8 (N.D. Ohio Apr. 23, 2021) (emphasis added).  The Agreement prohibits Cromer from "becom[ing] employed

---

[1]Cromer testified that he has engaged in three generic job duties at both Union Home and Homeside.  At both companies, Cromer testified he was "promoting the image and reputation . . . in the Youngstown area," "promoting . . . business and sales in the area where [the] Youngstown branch office was located," and "developing and maintaining a network of relationships with existing and prospective clients."

in the same or similar capacity" as he was with Union Home.  But the district court did not interpret that provision.  Nor did the district court define "competing with Union Home."

Defendants asked the district to court to clarify the meaning of "competing with Union Home" and specify the time period of the injunction.  The court declined because, in its view, defendants' motion was merely "an attempt to relitigate issues previously decided."

II.

Defendants raise two principal arguments on appeal.  *First*, they argue that the district court's preliminary injunction order is impermissibly vague under Federal Rule of Civil Procedure 65(d) because the order: (1) fails to describe what constitutes "competing with Union Home" and extends far beyond the terms of the Agreement; and (2) fails to identify the time period for the injunction.  *Second*, defendants contend the injunction is also unlawful because: (1) the noncompete covenant, as written, is unreasonable and unenforceable under Ohio law, and the injunction order compounds that unreasonableness; and (2) Union Home failed to establish the four preliminary injunction factors by clear and convincing evidence.

A.

As a threshold matter, the injunction order is impermissibly vague and overly broad. Rule 65(d) dictates:  "Every order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).    "[T]he specificity provisions of Rule 65(d) are no mere technical requirements."  *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam).

Rule 65(d)(1) serves two "important" functions: (1) "prevent uncertainty and confusion on the part of those faced with injunctive orders," and thus "avoid . . . a contempt citation on a decree too vague to be understood"; and (2) enable "an appellate tribunal to know precisely what it is reviewing."  *Id.* at 476-77.  To that end, an injunction must be couched in specific and unambiguous terms, such that "an ordinary person reading the court's order [is] able to ascertain from the document itself exactly what conduct is proscribed."  *Scott v. Schedler*, 826 F.3d 207,

211 (5th Cir. 2016); *see also Schmidt*, 414 U.S. at 476; *EEOC v. Wooster Brush Co. Emps. Relief Ass'n*, 727 F.2d 566, 576 (6th Cir. 1984) (finding the term "discriminating" too general). An injunction order is typically vacated when it violates this standard.

Several examples help to illustrate. The Supreme Court reversed a contempt decree founded upon a "vague" order for a union "to comply with and to abide by the [Arbitrator's] Award." *Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 69, 73-76 (1967). And in *Schmidt*, the Court vacated an injunction that told state officials "not to enforce 'the present [State] scheme' against those in the [plaintiffs'] class." 414 U.S. at 476-77. Likewise, this court vacated an injunction that prevented unions from "any further work stoppages" because it left the unions to "gauge their conduct" by reference to a particular agreement and then "test their interpretation of that agreement through contempt proceedings." *S. Ohio Coal Co. v. United Mine Workers*, 551 F.2d 695, 710-11 (6th Cir. 1977). This court has also held that it was insufficient for a district court to merely direct the parties "to comply with the terms of [a] service agreement." *Trans Union Credit Info. Co. v. Associated Credit Servs., Inc.*, 805 F.2d 188, 193-94 (6th Cir. 1986).

Cases from other circuits follow the same reasoning. The Eleventh Circuit reversed an injunction requiring an employer to transfer an employee to a "comparable" position. *Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1185-86 (11th Cir. 2010); *see also Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1411-12 (11th Cir. 1998) (holding injunction was impermissibly vague where it broadly enjoined defendant's use of plaintiff's "lists *or any other documents that contain trade secrets*" without indicating "the *types* of information, 'other' than 'lists,'" subject to the injunction). The Seventh Circuit vacated an injunction prohibiting use of the plaintiff's "confidential information and trade secrets" because it was "little more than a recitation of the law" given that it did not detail "the substance of the 'trade secret' or 'confidential information'" to which it referred—leaving "a lot of guesswork on [defendant]'s part in order to determine if it is engaging in activities that violate the injunction." *Patriot Homes, Inc. v. Forest River Hous., Inc.*, 512 F.3d 412, 414, 415-16 (7th Cir. 2008) (collecting cases). The same court also vacated an injunction in which the district judge did not "pin down ambiguous terms such as 'interfering.'" *BankDirect Capital Fin., LLC v. Capital Premium Fin.,*

*Inc.*, 912 F.3d 1054, 1057 (7th Cir. 2019) (Easterbrook, J.).  And the Third Circuit vacated an injunction because, *inter alia*, it "did not identify with specificity the information" constituting plaintiff's "trade secrets," and it prohibited individuals from working "in any capacity for any person or entity that is competitive with [plaintiff]" despite the absence of any such noncompete contract.  *Mallet & Co. v. Lacayo*, 16 F.4th 364, 380, 388-90 (3d Cir. 2021) (cleaned up).

The injunction here contains similar problems.

*First*, the word "competing" is too vague—like the words "interfering," *BankDirect*, 912 F.3d at 1057, "discriminating," *Wooster Brush*, 727 F.2d at 576, and "monopolizing," *Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110, 125-26 (1948).  The primary dispute in this case has always been the scope of the restriction that Cromer cannot be "employed in the *same or similar capacity* as [he] was employed with" Union Home.  (Emphasis added).  Yet the district court never interpreted the meaning of that phrase.  Instead, the court issued a blanket injunction prohibiting Cromer from "competing with Union Home," even though Union Home merely sought an injunction to enforce, *inter alia*, "*the non-compete covenant in the Employee Agreement*."  (Emphasis added).  Rather than resolve the vagueness in the language of the Agreement, the court simply substituted an equally vague prohibition: "competing with Union Home."  This leaves too much "guesswork" for defendants to structure their conduct.  *Patriot Homes*, 512 F.3d at 415.**²**

*Second*, the injunction "is addressed to mortal human beings, yet it has no limitation in time."  *N.L.R.B. v. Teamsters, Chauffeurs, Helpers & Taxicab Drivers, Loc. Union 327*, 419 F.2d 1282, 1283 (6th Cir. 1970).  Nor did the court mention the Agreement's extension provision.  *See BankDirect*, 912 F.3d at 1057.  That provision provides that if Cromer violates a covenant, then the covenants are "automatically" extended for one year "after the later of (a) the date on which [he] ceases such violation; or (b) the date of the entry . . . of any order or judgment enforcing such covenant."  Because the parties to the injunction are "left to guess about its intended

---

**²**Although defendants do not argue that the injunction is vague because it prohibits "using or disclosing Union Home's confidential information," that restraint would seem to present a similar deficiency because the injunction fails to "identify with specificity the information" that constitutes plaintiff's confidential information or trade secrets.  *Mallet*, 16 F.4th at 380-86; *see also Patriot Homes*, 512 F.3d at 415-16; *Am. Red Cross*, 143 F.3d at 1411-12.

duration," Rule 65(d) does not permit us to endorse the district court's injunction. *See Granny Goose Foods v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 444 (1974).

Union Home, nevertheless, suggests that the injunction is "clear" because the specific conduct proscribed can be inferred from "the facts of the case" and the "entirety" of the district court's opinion. We disagree. Although the district court's opinion quotes the restrictive covenants, *Cromer*, 2021 WL 1601193, at *2, that does not solve the problem. The court never explained how the noncompete provision could be construed to bar "competing with Union Home" writ large. Nor did the court state that the scope and duration of the injunction are co-extensive with the language in the Agreement. In fact, the concluding paragraph of the opinion states the conduct enjoined without any reference to previously quoted language.

But even if that were not the case, the defect cannot be cured by using such language as "in keeping with the opinions expressed herein." *Mitchell v. Seaboard Sys. R.R.*, 883 F.2d 451, 454 (6th Cir. 1989); *see also BankDirect*, 912 F.3d at 1057. Nor could the injunction describe the conduct enjoined by referencing the Agreement because that is another document. *See* Fed. R. Civ. P. 65(d)(1)(C). And merely reciting contract language would still be problematic because of the "likelihood that [the parties] will differ in interpreting some of the contractual terms." *Trans Union*, 805 F.2d at 193-94; *see also Longshoremen's Ass'n*, 389 U.S. at 69, 73-76; *S. Ohio Coal Co.*, 551 F.2d at 710-11; *Scott*, 826 F.3d at 213. That is especially true here. Accordingly, the injunction is impermissibly vague under Rule 65(d)(1).

*Third*, the injunction is overly broad. An injunction is overly broad when there is a risk that it restrains legal conduct, or the injunction prohibits illegal conduct that is not the subject of the litigation or is not closely related to the conduct found to justify injunctive relief. *See Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 360-61 (6th Cir. 1998); *S. Ohio Coal*, 551 F.2d at 710; *see, e.g.*, *Mallet*, 16 F.4th at 389; *Scott*, 826 F.3d at 214; *City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir. 2011).

The problem here is the mismatch between Cromer's Agreement and the breadth of the injunction. Cromer's Agreement prohibits a specific action—"becom[ing] employed in *the same or similar capacity* as [he] was employed with [Union Home] by . . . any entity that competes

with [Union Home]" within the identified 100-mile radius.  (Emphasis added).  But the injunction is an unmitigated restraint on Cromer "competing with Union Home" within the 100-mile radius.  *Cromer*, 2021 WL 1601193, at *8.  That broad prohibition can no doubt be read to encompass lawful conduct because it prohibits any form of competition—irrespective of Cromer's employer, job title, or duties.  As such, there is an inherent risk that the scope of the injunction exceeds the Agreement that the parties signed.**[3]**

As for the remedy, we decline to modify the injunction to rectify the defects.  *See, e.g.*, *Schmidt*, 414 U.S. at 477; *S. Ohio Coal*, 551 F.2d at 711; *Trans Union*, 805 F.2d at 194; *Mallet*, 16 F.4th at 380; *Scott*, 826 F.3d at 214.

Even if we were inclined to do so, the parties' central dispute still remains:  What is the scope of Cromer's covenant that he "will not become employed in *the same or similar capacity* as [he] was employed with" Union Home?  (Emphasis added).  For defendants' part, before the district court and on appeal, they point to differences between the following:  Cromer's job titles ("team leader/managing loan officer" at Union Home and "non-producing" "manager" at Homeside); corresponding job descriptions under federal regulations and Ohio law; Cromer's duties under his two employment agreements; compensation structure (commission and salaried); and the companies' job descriptions.  *See* 12 C.F.R. § 1026.36(a)(1); 12 C.F.R. Pt. 1026, Supp. I, Part 3, cmt. 36(a)(1), (4).  A manager is not a loan officer or "loan originator" if the manager merely engages in: "Application-related administrative and clerical tasks," "Responding to consumer inquiries and providing general information," "Loan Processing . . . on behalf of a loan originator," and "Underwriting, credit approval, and credit pricing." 12 C.F.R.

---

**[3]**To the extent defendants argue that Homeside is enjoined from operating its Youngstown office—regardless of Cromer's employment—that argument is baseless.  Rule 65(d)(2) states that an injunction may bind, *inter alia*, "persons who are in active concert or participation with" "the parties" or the parties' "agents."  Fed. R. Civ. P. 65(d)(2).  The injunction here does just that.  It restricts "Cromer and *anyone in active concert or participation with Cromer, including Defendant Homeside*."  *Cromer*, 2021 WL 1601193, at *8 (emphasis added).  To defendants' credit, however, Union Home sends mixed signals, claiming at times that "Homeside, having acted in concert with Cromer to violate his restrictive covenants, should be, and properly was, prevented from utilizing its new office in . . . Youngstown."  But the injunction says nothing of the sort.  Nor did the district court make findings to support such sweeping relief against Homeside based upon what occurred in the past.  In any event, generally "[t]he purpose of an injunction is to prevent future violations."  *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953).  Thus, so long as Homeside is not acting in "participation with Cromer," the injunction would not prevent Homeside from operating its Youngstown office.

Pt. 1026, Supp. I, Part 3, cmt. 36(a)(4)(i)-(iv); *see also* 12 C.F.R. § 1026.36(a)(1); Ohio Rev. Code § 1322.01(AA).

The district court bypassed this critical question, namely, the scope of the provision stating that Cromer cannot be "employed in the same or similar capacity as [he] was employed with" Union Home. Because this is "a court of review, not of first view," that question is for the district court to address in the first instance. *McLane Co. v. EEOC*, 137 S. Ct. 1159, 1170 (2017) (quoting *Cutter v. Wilkinson*, 544 U. S. 709, 718, n.7 (2005)); *see, e.g.*, *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 459 (6th Cir. 2019). After addressing that question, the district court will then be equipped to modify the injunction accordingly in the first instance.

B.

Although we "can hardly begin to assess the correctness" of the district court's injunction "without knowing its precise bounds," *Schmidt*, 414 U.S. at 477, it is possible to review one fatal legal error here. That is, the district court must reconsider the propriety of an injunction because it failed to analyze whether the noncompete covenant is enforceable under Ohio law.

There are "four factors [a court] must balance when considering a motion for preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam) (cleaned up). But where there is no likelihood of *either* success on the merits *or* irreparable harm, an injunction is unwarranted— regardless of the showing on the other factors. *See, e.g.*, *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326-27 (6th Cir. 2019); *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017); *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997); *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982).

We review legal determinations de novo, including the likelihood of success on the merits, but we review for abuse of discretion "the district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying

preliminary injunctive relief." *Schimmel*, 751 F.3d at 430 (citation omitted). Although the standard is "deferential," this court "may reverse the district court if it improperly applied the governing law, used an erroneous legal standard, or relied upon clearly erroneous findings of fact." *Id.*

*Success on the Merits.* The district court erred when it failed to consider whether the noncompete covenant is reasonable and thus enforceable. Union Home has no likelihood of success on the merits of its claim for breach of the restrictive covenants unless it shows—under applicable state law—that the covenants are enforceable and Cromer breached the covenants. *See S. Glazer's Distribs. of Ohio*, 860 F.3d at 849; *FirstEnergy Sols. Corp. v. Flerick*, 521 F. App'x 521, 525 (6th Cir. 2013); *see also Hidy Motors, Inc. v. Sheaffer*, 916 N.E.2d 1122, 1132 (Ohio Ct. App. 2009). A federal court sitting in diversity must apply the choice-of-law rules of the forum state, which is Ohio in this case. *Klaxon Co. v. Stentor Elect. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). "Ohio choice-of-law principles strongly favor upholding the chosen law of the contracting parties." *Wise v. Zwicker & Assocs., P.C.*, 780 F.3d 710, 715 (6th Cir. 2015) (citation omitted). Because the Agreement provides that Ohio law governs and the parties do not contend otherwise, we look to Ohio contract law. *See Baker Hughes Inc. v. S&S Chem., LLC*, 836 F.3d 554, 560 (6th Cir. 2016).

Under Ohio law, "only reasonable noncompetition agreements are enforceable." *Lake Land Emp't Grp. of Akron, LLC v. Columber*, 804 N.E.2d 27, 33 (Ohio 2004) (discussing *Raimonde v. Van Vlerah*, 325 N.E.2d 544 (Ohio 1975)). A noncompete covenant is reasonable if it satisfies three broad factors. The covenant must: (1) be "no greater than is required for the protection of the employer"; (2) "not impose undue hardship on the employee"; and (3) not be "injurious to the public." *Chi. Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 991 (6th Cir. 2007) (quoting *Raimonde*, 325 N.E.2d at 547). Union Home must establish each factor by "clear and convincing evidence." *Id.* (quoting *Levine v. Beckman*, 548 N.E.2d 267, 270 (Ohio Ct. App. 1988)); *see also Century Bus. Servs. v. Barton*, 967 N.E.2d 782, 795 (Ohio Ct. App. 2011).

In assessing each factor, there are nine fact-specific considerations to keep "in mind." *Rogers v. Runfola & Assocs.*, 565 N.E.2d 540, 543-44 (Ohio 1991) (citing *Raimonde*, 325 N.E.2d at 547).[4]

The district court did not analyze the *Raimonde* factors. The court merely recited *Raimonde*'s test and the four-factor preliminary injunction standard before summarily concluding that Union "has shown a substantial likelihood that Cromer has violated and is currently violating the enforceable covenants . . . with Union Home, as well as the Defend Trade Secrets Act, the Ohio Uniform Trade Secrets Act, and the common law." *Cromer*, 2021 WL 1601193, at *6-7. The court did not consider whether the 22-month post-employment restriction (beginning in November 2020) and the 100-mile radius restriction are "no greater than is required for the protection of the employer" and do "not impose undue hardship on the employee" under Ohio law. *Rogers*, 565 N.E.2d at 543 (cleaned up); *see, e.g.*, *Geloff v. R.C. Hemm's Glass Shops, Inc.*, 167 N.E.3d 1095, 1102 (Ohio Ct. App. 2021); *Brentlinger Enters. v. Curran*, 752 N.E.2d 994, 1004 (Ohio Ct. App. 2001). Conducting that analysis and making supporting findings are for the district court in the first instance. *See McLane*, 137 S. Ct. at 1170.

Because the district court did not analyze the *Raimonde* factors and make the necessary findings to conclude that the noncompete restrictions are enforceable, there can be no likelihood of success for Union Home on its claim for breach of the restrictions. Nor can the restrictions be enforced as written. And because a court cannot issue a preliminary injunction when there is no

---

[4]The nine fact-specific considerations are as follows: (1) "[T]he absence or presence of limitations as to time and space"; (2) "whether the employee represents the sole contact with the customer"; (3) "whether the employee is possessed with confidential information or trade secrets"; (4) "whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition"; (5) "whether the covenant seeks to stifle the inherent skill and experience of the employee"; (6) "whether the benefit to the employer is disproportional to the detriment to the employee"; (7) "whether the covenant operates as a bar to the employee's sole means of support"; (8) "whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment"; and (9) "whether the forbidden employment is merely incidental to the main employment." *Rogers*, 565 N.E.2d at 543 (quoting *Raimonde*, 325 N.E.2d at 547). We note that some courts applying Ohio law consider only the three general factors in assessing a covenant's reasonableness, *see, e.g.*, *Try Hours, Inc. v. Douville*, 985 N.E.2d 955, 965 (Ohio Ct. App. 2013); *Barton*, 967 N.E.2d at 795-96, and other courts consider the nine factors in that determination, *see, e.g.*, *Chi. Title*, 487 F.3d at 991-92; *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992); *Flerick*, 521 F. App'x at 526; *Wigton v. Univ. of Cincinnati Physicians, Inc.*, 179 N.E.3d 241, 244 (Ohio Ct. App. 2021); *AK Steel Corp. v. ArcelorMittal USA, LLC*, 55 N.E.3d 1152, 1155-56 (Ohio Ct. App. 2016). But in any event, "[c]ourts are empowered to modify or amend" a noncompete covenant to render it reasonable under Ohio law. *Chi. Title*, 487 F.3d at 991 (quoting *Raimonde*, 325 N.E.2d at 547).

likelihood of success on the merits, *see, e.g.*, *S. Glazer's Distribs. of Ohio*, 860 F.3d at 849, for this additional reason we vacate the preliminary injunction as to the noncompete provision in Cromer's Agreement.

\* \* \*

The preliminary injunction is VACATED and the case is REMANDED for further proceedings consistent with this opinion.