RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0081p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

THE JAMES B. OSWALD COMPANY, a wholly owned subsidiary of JBO Holding Company; JBO HOLDING COMPANY,

　　　　　　　　　　*Plaintiffs-Appellees*,

　　　*v.*

DENNIS NEATE; MICHAEL MAITLAND; ANNETTE BLANC; CHRISTINE PODLOGAR LOISELLE; HYLANT GROUP, INC.,

　　　　　　　　　　*Defendants-Appellants*.

No. 23-3638

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:22-cv-01107—Charles E. Fleming, District Judge.

Argued: March 19, 2024

Decided and Filed: April 10, 2024

Before: GRIFFIN, NALBANDIAN, and MATHIS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** David Rodman Cooper, MARSHALL & MELHORN, LLC, Toledo, Ohio, for Appellants. Stephen S. Zashin, Ami J. Patel, ZASHIN & RICH CO., L.P.A., Cleveland, Ohio, for Appellees. **ON BRIEF:** David Rodman Cooper, MARSHALL & MELHORN, LLC, Toledo, Ohio, Michael A. Gonzalez, THE HEALTH LAW GROUP, LLC, Maumee, Ohio, for Appellants. Stephen S. Zashin, Ami J. Patel, ZASHIN & RICH CO., L.P.A., Cleveland, Ohio, for Appellees.

---

**OPINION**

---

NALBANDIAN, Circuit Judge.  When Dennis Neate left the James B. Oswald Company, an insurance firm, to go work for Hylant Group, Inc, another insurance firm, some of his clients left with him.  Not happy about this, Oswald accused Neate of violating his non-solicitation agreement.  So Oswald sued in federal district court and the court entered a preliminary injunction ordering Neate and others to comply in full with Oswald's non-solicitation agreement.  Neate appealed.  For the following reasons, we VACATE and REMAND.

**I.**

Dennis Neate developed a substantial book of business over his sixteen years with the Hoffman Insurance Agency, where Neate was a part-owner of the company and an employee.  When the James B. Oswald Company and its parent company, JBO Holding, bought Hoffman in 2016, Oswald hired Neate as its vice president market leader in the property and casualty business unit.  Neate claims many of his Hoffman clients stayed with him even as he began working for Oswald.  In connection with the sale of Hoffman, Neate signed a contract—known as the "Hoffman Agreement"—that contained noncompete provisions prohibiting Neate from competing with or soliciting customers away from Oswald.  These provisions lasted five years from the date of the agreement.

Separately, in connection with his employment at Oswald, Neate and others had to sign a non-disclosure and non-solicitation agreement (NDNSA).  Relevant here, the NDNSA's Section 8 and 9 prohibited Oswald employees, for up to two years after the employees cease working for Oswald, from soliciting clients and employees away from the company.  R.65, Order Granting Prelim. Inj., pp.11–12, PageID 1688–89 (sealed).

Problems began in 2022 when Oswald changed Neate's role.  Unhappy with these changes, Neate resigned to work for Hylant Group, Inc., a different insurance company and an Oswald competitor.  Ultimately, about a third of Neate's clients followed him to Hylant.  The parties contest how and when Neate contacted clients to join him at Hylant and whether he used

Oswald's trade secrets in the process. And the parties continue to dispute whether Oswald can—and whether Oswald's NDNSA or the Hoffman Agreement does indeed—prevent Neate from contacting the clients he brought with him from Hoffman to Oswald.

So Oswald brought this lawsuit in June 2022, requesting both a temporary restraining order and a preliminary injunction. Along with suing Hylant, Oswald sued Dennis Neate, Michael Maitland, Annette Blanc, and Christine Podlogar Loiselle, all former Oswald employees who left for Hylant. The parties consented to stipulated restraining orders while litigation was pending. Oswald filed an amended complaint in August 2022, asserting eleven causes of action. Relevant on appeal, Oswald brought a breach-of-contract claim under Ohio law and a misappropriation-of-trade-secrets claim under the Defend Trade Secrets Act (DTSA), 18 U.S.C. §§ 1836–39, and the Ohio Uniform Trade Secrets Act (OUTSA), Ohio Rev. Code Ann. § 1333.61.

The district court held an evidentiary hearing to consider Oswald's motion for a preliminary injunction. After hearing live testimony and considering several exhibits, the district court granted the preliminary injunction. Read in full, the injunction provides:

> (a) Defendants Neate and Maitland (and any other person or entity acting in aid or concert, or in participation with them) are prohibited from the following: (1) committing further violations of their Agreements with Oswald; (2) retaining, copying, using, or disclosing any Oswald confidential, proprietary, or trade secret information, including but not limited to "Confidential Information" as defined in their Agreements with Oswald; (3) directly or indirectly soliciting, servicing, accepting business from, or assisting others in soliciting, servicing, or accepting business from Oswald's "Company Accounts" or "Company Prospects" as defined in their Agreements with Oswald; (4) directly or indirectly soliciting, attempting to solicit, or assisting others in attempting to solicit, any Oswald or Oswald Affiliate employee or independent sales representative to leave or terminate his or her employment or business relationship with Oswald or Oswald Affiliate;
>
> (b) Defendant Hylant (and any other person or entity acting in aid or concert, or in participation with it) is prohibited from the following: (1) accepting any new business from any Oswald customers or prospects who were contacted, solicited, and/or obtained as a result of any conduct or activities by Neate or Maitland or others acting in concert with them; (2) retaining, copying, using, or disclosing any Oswald confidential, proprietary, or trade secret information; and (3) interfering with Oswald's Agreements with its employees or independent contractors; and

> (c) All Defendants (and any person or entity acting in their aid or in concert with them) must search, identify, preserve, segregate, and ultimately return through forensic means all of Oswald's property, keeping no copy.

R.65, p.29, PageID 1706. The district court did not include Blanc and Loiselle in the injunction because "each terminated their employment with Oswald over two years ago and they are no longer bound by the terms of their Oswald NDNSAs." *Id.* at p.30, PageID 1707. Defendants appealed.[1]

## II.

Let's start with the basics. "A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal quotation marks omitted). So this "extraordinary remedy" should "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see also* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948 (3d ed. 2023) (Wright and Miller).

Before a court may grant a preliminary injunction, it must consider four things: (1) "whether the movant has a strong likelihood of success on the merits" and would (2) "suffer irreparable injury" without the injunction, (3) whether the injunction would substantially harm others, and (4) whether issuing the injunction serves the public interest. *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017). "But where there is no likelihood of *either* success on the merits *or* irreparable harm, an injunction is unwarranted—regardless of the showing on the other factors." *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 366 (6th Cir. 2022).

We give district courts' determinations of these four factors and their decisions granting a preliminary injunction some deference as we review for abuse of discretion. *Id.* But we review the court's legal determinations de novo and its findings of fact for clear error. *Great Lakes Brewing*, 860 F.3d at 849. This somewhat deferential standard will not save a district court's

---

[1]Defendants-Appellants in this case include individuals Neate and Maitland as well as the company Hylant. For ease of reference, and because their arguments are the same, this opinion refers to Neate in place of all three Defendants.

decision if it "improperly applied the governing law, used an erroneous legal standard, or relied upon clearly erroneous findings of fact." *Cromer*, 31 F.4th at 366 (quoting *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014)); *see also Union Tool Co. v. Wilson*, 259 U.S. 107, 112 (1922) (explaining that "legal discretion . . . does not extend to a refusal to apply well-settled principles of law" to facts).

## III.

Neate argues that (1) the NDNSA is unreasonable and therefore unenforceable, (2) the district court erred in analyzing what constituted a "trade secret," and (3) the district court's injunction is impermissibly vague, failing to satisfy the specificity requirements of Federal Rule of Civil Procedure 65(d)(1). We examine each in turn.[2]

## A.

Neate believes the NDNSA is unenforceable under Ohio law.[3] And Oswald "has no likelihood of success on the merits" for its breach-of-contract claim "unless it shows—under applicable state law—that the [NDNSA is] enforceable." *Cromer*, 31 F.4th at 366. When Ohio courts evaluate noncompetition agreements, they compare the reasonableness of the restrictions on the employee with the "employer's legitimate interests" using three factors. *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975); *Lake Land Emp't Grp. of Akron, LLC v. Columber*, 804 N.E.2d 27, 33 (Ohio 2004). The agreement must (1) be "no greater than is required for the protection of the employer," (2) "not impose undue hardship on the employee," and (3) not be "injurious to the public." *Raimonde*, 325 N.E.2d at 547. On the first factor, noncompete "clauses will be enforced only to the extent that the restraints imposed thereby are reasonably necessary to protect the employer's legitimate business interests." *Brentlinger Enters. v. Curran*,

---

[2]Defendants also challenged the district court's finding that Oswald's NDNSA, and not the Hoffman Agreement, governs this dispute. Appellant Br. at 13–14. But Defendants' counsel at oral argument conceded that, for this appeal, the NDNSA governs.

[3]Both parties agree Ohio law governs. Appellant Br. at 14; Appellee Br. at 34. For a likelihood of success on a breach-of-contract claim under Ohio law, the plaintiff must show "the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach." *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 463 (Ohio 2018); *Richelson v. Liberty Ins. Corp.*, 796 F. App'x 277, 281 (6th Cir. 2020).

752 N.E.2d 994, 998 (Ohio App. 2001); *see also Arthur J. Gallagher & Co. v. Anthony*, No. 16-CV-00284, 2016 WL 4523104, at \*11 (N.D. Ohio Aug. 30, 2016). Oswald "must establish each factor by clear and convincing evidence." *Cromer*, 31 F.4th at 366 (internal quotation marks omitted). And because "each case must be decided on its own facts," *Raimonde*, 325 N.E.2d at 547, when they evaluate the reasonableness of the restrictions, courts should keep in mind nine "fact-specific considerations," *Cromer*, 31 F.4th at 366.[4]

Neate urges us to reverse the district court's decision because it "failed to analyze the *Raimonde* factors as required by Ohio law." Appellant Br. at 15. Neate is correct. The district court acknowledged that "Ohio law disfavors restrictive covenants and that a careful weighing of the reasonable factors dictated in *Raimonde* is necessary to determine that the restriction is reasonable." R.65, p.14, PageID 1691 (cleaned up). But rather than consider the "necessary" factors, the court merely concluded that it was reasonable to "restrict an employee from moving to a competitor and taking customers and other employees with them for two years following the employee's departure" under Sixth Circuit precedent. *Id.* (citing *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 992 (6th Cir. 2007)). The court also relied on the fact that Hylant and Oswald require "nearly identical" non-solicitation agreements in finding the NDNSA reasonable. *Id.* at pp.14–15, PageID 1691–92.

This is not the analysis Ohio law demands. Indeed, we have reversed lower courts for precisely this mistake. In *Cromer*, the district court "merely recited *Raimonde*'s test and the four-factor preliminary injunction standard before summarily concluding" that the noncompete was reasonable. 31 F.4th at 367. "Because the district court did not analyze the *Raimonde* factors and make the necessary findings to conclude that the noncompete restrictions are

---

[4]"The nine fact-specific considerations are as follows: (1) The absence or presence of limitations as to time and space; (2) whether the employee represents the sole contact with the customer; (3) whether the employee is possessed with confidential information or trade secrets; (4) whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; (5) whether the covenant seeks to stifle the inherent skill and experience of the employee; (6) whether the benefit to the employer is disproportional to the detriment to the employee; (7) whether the covenant operates as a bar to the employee's sole means of support; (8) whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and (9) whether the forbidden employment is merely incidental to the main employment." *Cromer*, 31 F.4th at 366 n.4 (cleaned up). Some Ohio courts assess the covenant's reasonableness using the three general factors only, but others consider these nine factors. *Id.* (collecting cases). So the nine fact-specific factors help guide the analysis but are not individually necessary.

enforceable, there can be no likelihood of success" on the breach-of-contract claim. *Id.* Here, the district court only referenced *Raimonde* in the one instance quoted above, R.65, p.14, PageID 1691, which is insufficient under *Cromer*.

Oswald urges a different reading. *Cromer* reversed the district court because, according to Oswald, it "fail[ed] to make any determination at all as to whether the restrictive covenants at issue were reasonable, the *Raimonde* factors notwithstanding." Appellee Br. at 34–35 (emphasis omitted). But this ignores important context. In the first sentence applying Ohio law to the case before it, the *Cromer* court explained that the "district court did not analyze the *Raimonde* factors." 31 F.4th at 367. Then in the following paragraph, the court says there can be no success on the merits "[b]ecause the district court did not analyze the *Raimonde* factors," not because it made no determination. *Id.* So Oswald's attempt to hide *Raimonde*'s essential nature misses the mark. Oswald also invokes past cases, attempting to show that its NDNSA is "reasonable under Ohio law." Appellee Br. at 33–34. But past cases get Oswald only so far. Even if these cases prove persuasive, simply citing them elides the "fact-specific" analysis Ohio law requires. *Cromer*, 31 F.4th at 366.[5]

Because the district court failed to make such findings below in the context of the *Raimonde* factors, it failed to properly apply governing law. We have reversed district courts for this type of mistake. *Cromer*, 31 F.4th at 366. So the court committed reversible error.[6]

---

[5]The parties try to argue the *Raimonde* factors on appeal. *See* Appellant Br. at 18–21 (arguing about several of *Raimonde*'s fact-specific factors that the district court did not address); Appellee Br. at 35 (briefly arguing that the *Raimonde* factors show that the NDNSA is reasonable). But we think the better course here is to remand for the district court to analyze these factors in greater detail in the first instance. *See Cromer*, 31 F.4th at 367.

[6]We note that on remand, the district court should address the argument that "[e]mployers have a stronger protectable interest when the customers are more customers of the firm rather than customers who came to the firm because of the employee." *Arthur J. Gallagher & Co. v. Anthony*, No. 16-CV-00284, 2016 WL 4523104, at *11 (N.D. Ohio Aug. 30, 2016). Neate relies on this case to argue that "Ohio law precludes Oswald from enforcing the NDNSA against Mr. Neate because Mr. Neate developed his client relationships during his decades-long career in the insurance industry prior to his employment with Oswald." Appellant Br. at 21. Indeed, Defendants dedicate over a dozen pages of their appellate brief to the argument that the district court "failed to consider Appellants' main legal argument . . . that, under Ohio law, an employer like Oswald has no legitimate, protectable business interest in preventing a former employee, like Mr. Neate, from soliciting clients who came to Oswald solely to avail themselves of Neate's services and only as a result of his own independent recruitment efforts." *Id.* at 15 (internal quotation marks omitted).

**B.**

We next consider the trade-secret claim.  The district court found, under both the OUTSA, Ohio Rev. Code § 1333.61, and the DTSA, 18 U.S.C. § 1839, that Oswald "established that non-public Oswald employee and customer information such as customer lists, pricing strategies, and customer preferences are trade secrets."  R.65, p.7, PageID 1684.  But Neate believes the client information that he cultivated and maintained on his own before he became employed at Oswald is not a trade secret.

We review de novo the district court's overall legal conclusion on the likelihood of success on the merits, but within that determination, we review questions of fact for clear error. *Great Lakes Brewing*, 860 F.3d at 849.  And past cases have treated whether something is a "trade secret" and whether it has been "misappropriated" as factual questions.  *RGIS, LLC v. Gerdes*, 817 F. App'x 158, 161–62 (6th Cir. 2020) (explaining that courts have found that "both the 'trade secret' and the 'misappropriation' elements" of a trade-secret claim "raise fact questions reviewed under the clear-error standard"); *see also Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 31 (6th Cir. 2011); *Par Pharm., Inc. v. QuVa Pharma, Inc.*, 764 F. App'x 273, 278–79 (3d Cir. 2019).[7]  This is consistent with how Ohio law treats these questions.  "[W]hether [] particular knowledge . . . is a trade secret is a question of fact to be determined by the trier of fact upon the greater weight of the evidence."  *Fred Siegel Co. v. Arter & Hadden*, 707 N.E.2d 853, 856 (Ohio 1999) (citing *Valco Cincinnati, Inc. v. N & D Machining Serv.*, 492 N.E.2d 814, 819 (Ohio 1986)).

Under the OUTSA, a trade secret is "information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers" that both (1) "derives independent economic value, actual or potential, from not being generally known to,

---

Although Neate's argument seems founded solely in two unpublished district court cases from the Northern District of Ohio rather than Ohio state cases, we leave it to the district court to evaluate its persuasiveness in the first instance.

[7]*RGIS* dealt with trade-secret claims under both Michigan and federal law.  *See RGIS*, 817 F. App'x at 162.

and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and (2) "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Ohio Rev. Code § 1333.61(D).

And under the DTSA, "the term 'trade secret' means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if" (1) "the owner thereof has taken reasonable measures to keep such information secret" and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). So under both statutes, the information must have independent economic value, and the company must take reasonable steps to keep it secret.

Oswald claims that Neate and the other Defendants misappropriated "key . . . workforce and personnel contact information, customer contact information, needs and preferences, and other customer-related information." R.19, p.29, PageID 389. Neate responds that this information does not constitute trade secrets under Ohio or federal law because it concerned only clients that Neate brought to Oswald—information that Neate "had known for years before joining Oswald"—not client information Neate learned or developed at Oswald. Appellant Br. at 24.

The district court correctly concluded that the relevant client information in this case constituted a trade secret. This information has evident economic value because it's how Oswald gains revenue and attempts to grow its business. *See Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 972, 986 (N.D. Ohio 2008) (noting that customer lists can be trade secrets under Ohio law); *Al Minor Assoc., Inc. v. Martin*, 881 N.E.2d 850, 855 (Ohio 2008) (holding that memorized client lists can still constitute trade secrets). It certainly must have economic value because Oswald expended considerable money, time, and resources to gather this information, including buying Neate's book of business for a significant sum, and it spent money helping Neate

cultivate, maintain, and grow this customer information. *See* R.55, Prelim. Inj. Hr'g. Tr., pp.3, 6, PageID 1389, 1392 (sealed).

And Oswald has tried to keep this information secret. Catherine Kosin, the director of the property and casualty unit at Oswald, testified that it protects its confidential client information, which is not known to the public, via "standard security systems," such as by using passwords, firewalls, different employee authorization depending on his or her role within the company, and "[r]obust IT security." *Id.* at pp.138–41, PageID 1524–27.

Neate's counterarguments are unpersuasive. Neate believes "information that can be gleaned directly from the client is not a trade secret." Appellant Br. at 25 (internal quotation marks omitted). So he asserts that the "district court's decision here that Mr. Neate's clients' names and phone numbers that Mr. Neate brought to Oswald himself and had known for years before joining Oswald constitute trade secrets is clear error." *Id.* at 24–26 (citing *Arthur J. Gallagher*, 2016 WL 4523104, at *19 and *James B. Oswald Co. v. Stratos Wealth Partners, Ltd.*, No. 1:18 CV 2114, 2020 WL 13454004, at *10 (N.D. Ohio Sept. 30, 2020)).

But these cases are distinguishable because the client information in those cases was publicly available, *Gallagher*, 2016 WL 4523104, at *12 (explaining that Gallagher had "little or no protectable customer information" because it was publicly available); *Stratos*, 2020 WL 13454004, at *8 (finding a genuine dispute of material fact as to whether the client list at issue constituted a trade secret because there was a dispute over whether such information was publicly available). So when Neate quotes *Gallagher* saying "customer information" is not a trade secret if it is "re-creatable from public sources on the internet *or from customers themselves*," Appellant Br. at 26 (quoting *Gallagher*, 2016 WL 4523104, at *19), this assertion only applies directly to publicly available information. In *Gallagher*, the information was not protected and confidential but was open for anyone to access and recreate. So the district court did not err in determining that the relevant client information here is a trade secret.**[8]**

---

**[8]**By invoking *Gallagher* and *Stratos* in the trade-secrets context, Neate also gestures to the argument that information brought with him from Hoffman is not a trade secret because Oswald has no legitimate business interest in that information anyway. But we find no support for the idea that information that an employee brings with him from a former company—information for which the new company paid valuable consideration—cannot be a trade

Thus, we agree with the district court that Oswald has shown a likelihood of success of prevailing on the merits of its trade-secrets claims.

## C.

So that leaves Neate's claim that the injunction is impermissibly vague. The district court enjoined Neate and Maitland from "committing further violations of their Agreements with Oswald," taking certain actions "as defined in their Agreements with Oswald," and "soliciting, servicing, or accepting business from Oswald's 'Company Accounts' or 'Company Prospects' as defined in their Agreements with Oswald." R.65, p.29, PageID 1706. Neate argues this does not meet Rule 65(d)(1)'s specificity requirements, which "protect[] the party . . . by requiring clear notice as to what that party must do or refrain from doing." *Abbott v. Perez*, 585 U.S. 579, 598 (2018).

Start with the text. An injunction order "must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). And the "specificity provisions of Rule 65(d) are no mere technical requirements." *Cromer*, 31 F.4th at 362 (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam)). The Supreme Court has told us that Rule 65(d)(1) serves two "important" functions: (1) "to prevent uncertainty and confusion on the part of those faced with injunctive orders," and thus avoid "a contempt citation on a decree too vague to be understood"; and (2) to enable "an appellate tribunal to know precisely what it is reviewing." *Schmidt*, 414 U.S. at 476–77. So a district court must word its order in a way that "an ordinary person reading the court's order [can] ascertain from the document itself exactly what conduct is proscribed." Wright and Miller § 2955; *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (quoting same language); 2 Sean M. Berkowitz & Eric R. Swibel, *Business and Commercial Litigation in Federal Courts* § 23:17 (5th ed. 2022) (An "ordinary person should be able to ascertain exactly the proscribed conduct.").

---

secret under the DTSA or the OUTSA. Instead, we analyze that information under our usual standard: does it have independent economic value, and has the company taken steps to keep it secret? So to the extent Neate attempts to draw a bright line and say that the information he brought with him from Hoffman cannot be a trade secret, we reject it.

We "typically vacate[]" an injunction order that "violates this standard." *Cromer*, 31 F.4th at 362.

Next, consider the Rule's structure. The requirement to "describe [the restrained or required conduct] in reasonable detail" in Rule 65(d)(1)(C) appears "repetitious" of the requirement that the order "state its terms specifically" in (B). Wright and Miller § 2955; *see also Dekar Indus., Inc. v. Bissett-Berman Corp.*, 434 F.2d 1304, 1306 (9th Cir. 1970) (implying that both phrases prescribe the same standard). The overlap in the specificity requirements of each provision has led some to reason that one possible explanation of including (C) at all is to make explicit the rule that injunctions may not incorporate extraneous documents by reference. *See* Wright and Miller § 2955 ("Possibly the crux" of Rule 65(d)(1)(C) "is the prohibition against incorporation by reference."). That is why "most courts that have mentioned the third requirement of Rule 65(d)(1) have done so in cases in which reference has been made in the injunction to outside documents." *Id.* & n.55 (collecting cases). So giving force to Rule 65's prohibition on incorporation by reference makes the most sense of not only the Rule's text but also the Rule as a whole.

Last, look at past cases. We have rejected attempts to specify an injunction's requirements by reference to other documents. *Cromer*, 31 F.4th at 364 (holding that the injunction could not "describe the conduct enjoined by referencing the Agreement because that is another document"); *Trans Union Credit Info. Co. v. Associated Credit Servs., Inc.*, 805 F.2d 188, 193–94 (6th Cir. 1986) (explaining that it "contravenes" Rule 65(d) to "merely direct[] the parties to comply with the terms of the service agreement"); *see also Int'l Longshoremen's Ass'n, Loc. 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 74–75 (1967).

And this approach tracks how our sister circuits have applied the Rule. *See* 13 *Moore's Federal Practice* § 65.60 n.7 (2023) (collecting cases). The Second Circuit, for example, reversed an injunction that attempted to incorporate by reference a consent judgment in another case. *See Dunn v. N.Y. State Dep't of Lab.*, 47 F.3d 485, 489 (2d Cir. 1995) ("The district court's order does not recite the requirements of [the order] or annex a copy of" the order.). Indeed, the court explained that "even if it were permissible for an injunction to incorporate another document by reference, there is no indication that the . . . consent judgment is a fixed document:

it is currently the subject of ongoing litigation before another district court judge." *Id.* The Seventh Circuit has intoned that incorporation by reference is prohibited by Rule 65(d). *See Dupuy v. Samuels*, 465 F.3d 757, 758–760 (7th Cir. 2006). And the Eleventh Circuit has extolled the overall goal of Rule 65(d) as ensuring that "the parties subject thereto understand their obligations under the order." *SEC v. Goble*, 682 F.3d 934, 952 (11th Cir. 2012) (internal quotation marks omitted). So it declined to enforce Rule 65(d) "rigidly" but still reasoned that a "person enjoined by court order should only be required to look within the four corners of the injunction to determine what he must do or refrain from doing." *Id.* (citation omitted).[9]

Applying that framework here, we see that the injunction does not satisfy Rule 65(d)(1). Oswald admits that the "injunction largely mirrors the language that Appellants agreed to previously: it references Neate and Maitland's NDNSAs and describes in explicit detail the conduct from which they must refrain, including the conduct that the NDNSAs prohibit." Appellee Br. at 53 (emphasis omitted). So the text, structure, and previous interpretations of Rule 65(d)(1) all point in one direction: incorporating the NDNSA into the injunction does not live up to what the Rule requires.[10]

---

[9]And when other circuits have found exceptions to this rule, they have done so for reasons not present here. The Ninth Circuit explained that though "a number of our sister circuits read" Rule 65(d)'s "requirement strictly, we have permitted incorporation by reference in certain limited scenarios, for example, where the referenced document is physically attached to the order itself." *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1132–33 (9th Cir. 2006) (internal quotation marks omitted); *see also California ex rel. Cal. Dep't of Toxic Substances Control v. Campbell*, 138 F.3d 772, 783 (9th Cir. 1998) (explaining that incorporating another document by reference was not reversible error because the "defendants were aware of the order because it was physically attached to the injunction itself," so "the defendants received adequate notice that they could face contempt if they violated the order"). The Tenth Circuit has said that incorporating a temporary restraining order by reference is okay given that the parties were already on notice of what conduct was prohibited by the TRO. *Reliance Ins. Co. v. Mast Constr. Co.*, 159 F.3d 1311, 1317 (10th Cir. 1998). These narrow exceptions reveal the reach of the overall rule.

[10]This does not mean that any injunction that references another document will automatically violate Rule 65(d)(1). *See* 2 Sean M. Berkowitz & Eric R. Swibel, Business and Commercial Litigation in Federal Courts § 23:17 (5th ed. 2022) ("While Rule 65(d) prohibits achieving such detailed description via reference to another document, some courts have allowed reference to extraneous documents, observing that a less strict interpretation does not conflict with the purpose of the Rule."); 13 *Moore's Federal Practice* § 65.60 (2023) ("It may be proper for an injunction to repeat the language of a statute or equivalent provision, so long as that language sets forth specific, objective criteria for compliance."); *compare Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.*, 84 F.3d 367, 371 (10th Cir. 1996) (requiring strict compliance with prohibition on outside references), *H. K. Porter Co., Inc. v. Nat'l Friction Prods. Corp.*, 568 F.2d 24, 27 (7th Cir. 1977) (same), *and Seattle-First Nat'l Bank v. Manges*, 900 F.2d 795, 800 (5th Cir. 1990) (same), *with McCord*, 452 F.3d at 1132–33 (permitting incorporation by reference "in certain limited scenarios"), *and Seagram-Distillers Corp. v. New Cut Rate Liquors*, 221 F.2d 815, 821 (7th Cir. 1955) (permitting reference to extraneous contracts where market prices would vary over time).

The district court therefore committed reversible error under Rule 65(d)(1) by leaving too much up to the controverted meaning of the NDNSA, one of the original sources of this lawsuit. And we decline to modify the injunction to cure its defects. *See Cromer*, 31 F.4th at 365; *Schmidt*, 414 U.S. at 477.

## IV.

Though we don't see anything wrong with the district court's trade-secrets conclusions, the lack of any *Raimonde* analysis and the lack of Rule 65(d)'s required specificity are fatal flaws in the injunction. So we VACATE and REMAND for proceedings consistent with this opinion.

---

So in certain, limited circumstances, it may be appropriate to reference a different document as long as the language and the context of injunction itself makes sufficiently clear what is required and what is prohibited. *See* 13 *Moore's Federal Practice* § 65.60 n.9.02 (2023) (An "[i]njunction may repeat statutory language that is specific."); *Goble*, 682 F.3d at 950–52 (A "broad, but properly drafted injunction, which largely uses the statutory or regulatory language may satisfy the specificity requirement of Rule 65(d) so long as it clearly lets the defendant know what he is ordered to do or not do."). Given that the specificity of the injunction will require inquiries into the specific text and context of each individual injunction, we therefore do not establish a categorical rule today but leave it to future cases to trace the appropriate contours of Rule 65(d)(1)(C). Sufficient for our purposes is the holding that the injunction at issue fails.