NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0400n.06

No. 23-3713

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Oct 02, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| TOTAL QUALITY LOGISTICS, LLC, | ) | |
|  | ) | |
|     Plaintiff-Appellant, | ) | |
|  | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
|  | ) | COURT FOR THE |
| EDA LOGISTICS LLC; RYAN C. DANIELS, | ) | SOUTHERN DISTRICT OF |
|  | ) | OHIO |
|     Defendants-Appellees. | ) | |
|  | ) | OPINION |
|  | ) | |

Before: GILMAN, STRANCH, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. Ryan Daniels worked as a Logistics Account Executive for Total Quality Logistics, LLC (TQL), for four and a half years. His employment agreement included a non-compete and non-solicitation clause. Daniels resigned from TQL in June of 2020, after a disagreement over TQL's return-to-the-office COVID-19 policy. Daniels later started a competing logistics firm. The firm worked with some of the same customers Daniels had serviced during his employment at TQL. TQL sued. After a bench trial, the district court concluded that Daniels had breached the non-compete agreement. But the court refused to enjoin Daniels' participation in the logistics industry generally, concluding that the non-compete was enforceable only to the extent that it prevented solicitation of customers that Daniels knew through his time at TQL. The court also concluded that a fee-shifting provision in the parties' contract was unenforceable, and that TQL had failed to prove its case on certain claims or a non-speculative amount of money damages. TQL now appeals. We AFFIRM.

I.

TQL is a logistics company that connects customers who need freight moved with trucking companies able to perform the work. The logistics industry is very competitive, with many brokers working to make those connections. TQL hired Ryan Daniels as a Logistics Account Executive (LAE), or broker, in 2016. TQL intentionally hires job candidates with little to no logistics experience so that it can teach them the TQL "recipe." Trial Tr., R. 31, PageID 809. Upon joining TQL, Daniels had no third-party logistics experience, though he had some general sales experience.

As a condition of employment, Daniels executed an "Employee Non-Compete, Confidentiality and Non-Solicitation Agreement." Joint Ex. 2003, R. 44-4, PageID 1241–47. TQL made the agreement available for Daniels' review before his first day of work. Daniels agreed that he would not, for one year after termination of his employment, "directly or indirectly[] own, operate, maintain, consult with, be employed by (including self-employment), engage in, or have any other interest . . . in any Competing Business." *Id.* at 1244 (§ 9(b)(i)). The Agreement defines "Competing Business" as "any person, firm, corporation, or entity that is engaged in shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management services anywhere in the Continental United States." *Id.* at 1246 (§ 9(f)). The Agreement further prohibits the solicitation of any of TQL's customers and the use of any trade secrets, including "[c]ustomer lists," for the benefit of any entity other than TQL. *Id.* at 1245 (§ 9(b)(iii), (c)). Finally, the Agreement provides that Daniels "shall be liable for costs, expenses, and reasonable attorneys' fees incurred by TQL" if a court finds that he violated the agreement. *Id.* (§ 9(e)). The fees provision is unilateral; it would not allow Daniels to recover fees if TQL were to bring an unsuccessful enforcement action, or if Daniels sued TQL for breach of the agreement. At trial,

-2-

TQL's witness testified that he had never heard of any potential employee negotiating different terms for the agreement.

Daniels joined TQL as an LAE trainee. TQL's witness, Marc Bostwick, testified about the training generally provided to LAEs, though he acknowledged that he "lacked direct knowledge of much of the training that Daniels received." *Total Quality Logistics, LLC v. EDA Logistics LLC* (*TQL/EDA*), 685 F. Supp. 3d 563, 569 (S.D. Ohio 2023). Bostwick described an LAE's training as including information about the logistics industry, such as common acronyms and lingo. An LAE typically makes many cold calls to discover whether potential customers need freight moved. Bostwick explained that TQL had a flow chart and scripts to help LAEs learn how to get past "gatekeepers" and speak to customer decisionmakers. TQL has prepared training courses and compiled information to teach these skills along with other general sales and industry tactics like how to penetrate an account, get to know a customer, and find motor carriers. Bostwick also discussed TQL's proprietary "Load Manager" system, used to log customer information, preferences, contacts, and the like. Bostwick explained that TQL spends considerable money and resources in curating its training, though he acknowledged that much of the training content is available on the internet.

Daniels worked for TQL for four and a half years. During that time, he built relationships with customers who needed freight moved. Daniels input some customer-contact information into his personal cell phone, and he regularly used his cellphone to conduct business on behalf of TQL. During his time at TQL, he developed relationships with nine customers relevant to this dispute. Eight were preexisting TQL customers for whom Daniels assumed responsibility; one Daniels helped bring into "the TQL fold" (though that customer was previously on TQL's radar). Trial Tr., R. 31, PageID 989–90.

Daniels resigned from TQL in June of 2020 after a disagreement over TQL's return-to-office COVID-19 policy. Daniels' son had respiratory issues, so Daniels wished to continue working from home. Upon his departure, TQL emailed Daniels to remind him of his obligations under the non-compete agreement. When he left TQL, Daniels retained the customer-contact information that was in his personal cell phone.

Daniels began working "at a better rate" for an "old friend" who operated Direct Freight Solutions. *Id.* at 1003. Like TQL, Direct Freight was a third-party logistics company. Daniels went to Direct Freight Solutions with the understanding that he would eventually take over the business. Daniels did not solicit any TQL customers while working for Direct Freight. Daniels' employment with Direct Freight soon ended, however, when the owner suddenly passed away.

Daniels then obtained a license to broker freight and started his own LLC, EDA Logistics (EDA). Daniels, on behalf of EDA Logistics, solicited customers that he knew from his time at TQL. Daniels acknowledged that "all the training and knowledge and experience [he] had in third-party logistics" "came from TQL." *Id.* at 973. And because of that experience and knowledge, he was able to "hit the ground running" after starting his LLC. *Id.* at 1009.

Most of EDA's business came from customers with whom Daniels had formed relationships while at TQL. The bulk of EDA's work came from one customer in particular, Sunland Trading, an account Daniels had serviced while at TQL. From his time at TQL, Daniels was aware of the "lanes," or routes, for which Sunland often needed freight services. Daniels began providing that service for Sunland through EDA.

Meanwhile, TQL re-assigned Daniels' former customer accounts to other LAEs. Just what efforts TQL made to continue servicing those customers remains uncertain.[1] At any rate, TQL experienced a decline in business from some customers that Daniels had serviced while at TQL.

TQL began to suspect that Daniels was operating a competing business, so it investigated whether he was violating the non-compete agreement. TQL discovered that Daniels had started EDA Logistics and obtained brokerage authority. TQL sued Daniels and EDA Logistics in Ohio state court, asserting claims for breach of contract, misappropriation of trade secrets, tortious interference with contract, and tortious interference with business relations. TQL sought preliminary and permanent injunctive relief, as well as money damages. Daniels removed the case to the United States District Court for Southern District of Ohio.

After discovery, the case proceeded to a bench trial. TQL called its risk manager, Marc Bostwick, as well as Daniels as witnesses. Daniels' counsel cross-examined Bostwick and elicited testimony from Daniels; Daniels called no new witnesses. The district court found for TQL on its breach-of-contract claim. It concluded that the non-compete agreement was enforceable, but only to the extent that it prevented Daniels from contacting customers with whom he had developed relationships while employed at TQL. *TQL/EDA*, 685 F. Supp. 3d at 575–76. The district court reasoned that a money-damages award would be impermissibly speculative, however, because TQL had failed to prove a specific amount of lost profits. *Id.* at 579–80. The court enjoined Daniels from servicing any customers with whom he had done business while at TQL for 313 days from the entry of the order—the contractual period of one year less the time Daniels had spent at

---

[1] During pre-trial discovery, Daniels requested documents regarding TQL's efforts to retain the customers Daniels later serviced for EDA. TQL refused to produce those documents. So the district court did not permit TQL's witness to testify about their contents. TQL does not challenge the district court's evidentiary ruling on appeal.

Direct Freight, where he did not solicit former customers. *Id.* at 580 & n.5. The district court concluded that TQL had not proved its claims for misappropriation of trade secrets, s*ee id.* at 577, but found for TQL as to its tortious-interference claims against Daniels (but not against EDA), *id.* at 578. Finally, the court concluded that the contractual provision allowing for the unilateral recovery of TQL's attorneys' fees was unenforceable under Ohio law. *Id.* at 583.

TQL now appeals, arguing that it did not get all the relief to which it is entitled. Daniels and EDA do not cross-appeal the adverse portions of the district court's judgment, including the entry of injunctive relief. TQL does not challenge the district court's judgment as to the tortious-interference claims against EDA.

## II.

In an appeal from a bench trial, we review factual findings for clear error and legal conclusions de novo. *Walsh v. KDE Equine, LLC*, 56 F.4th 409, 412–13 (6th Cir. 2022). Clear-error review means that when the "district court's account of the evidence is plausible in light of the record viewed in its entirety," we "may not reverse," even if we "would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985). This rule controls "even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Id.* at 574.

No party disputes that Ohio law governs the parties' contract.

## A.

TQL first challenges the district court's decision not to award money damages. The district court concluded that money damages would be impermissibly speculative because TQL had failed to show that, "absent Daniels' intervention, the customers would have used TQL, or relatedly the profits that TQL would have generated if they did." *TQL/EDA*, 685 F. Supp. 3d at 579. It reasoned

that TQL had not shown the efforts it took to pursue the at-issue customers after Daniels left, or how Daniels' "competition thwarted TQL's efforts to secure business from these companies." *Id.* at 579 n.4. Finally, the district court noted that TQL did not "present any evidence regarding its profit on contracts with these customers or with customers generally." *Id.*

TQL argues that it proved damages with the "reasonable certainty" needed to satisfy Ohio law. TQL asserts that the district court imposed a direct-evidence requirement, disregarding the circumstantial evidence that TQL proffered. That evidence, TQL notes, included Daniels' admission to soliciting former TQL customers; the profits Daniels earned from servicing those customers; the fact that any load Daniels brokered for the customer would be a load "off the table for TQL to broker"; and that TQL's profits from those customers diminished in the quarter immediately following Daniels' departure. Appellant Br. at 28–30. "Thus, EDA's and Daniels's profits prove with sufficient certainty the profits on which TQL lost out." *Id.* at 28.

The district court's account of the evidence was not clearly erroneous. TQL failed to produce evidence that Daniels' unlawful competition (rather than, say, his mere departure and TQL's failure to meaningfully pursue its customers) caused TQL's lost profits. TQL continues to ask for the entire profit that Daniels made by servicing the at-issue customers, $148,821.80. Yet a factfinder could reasonably conclude that TQL did not demonstrate that, had Daniels not serviced those loads, the work would have flowed to TQL. *TQL/EDA*, 685 F. Supp. 3d at 579; *see also id.* at 570.

Moreover, we find no error in the district court's refusal to grant TQL an inferential leap from the profits that Daniels earned for EDA Logistics. Though TQL points out that some Ohio courts have accepted, as a permissible measure of damages, an accounting of the profits earned by an unlawfully competing former employee, none mandates TQL's preferred measure of damages

as a matter of law. *See Try Hours, Inc. v. Swartz*, No. L-06-1077, 2007 WL 867106 (Ohio Ct. App. Mar. 23, 2007); *Am. Logistics Grp., Inc. v. Weinpert*, No. 85041, 2005 WL 2240987 (Ohio Ct. App. Sept. 15, 2005); *Cleveland Cotton Prods. v. James*, No. 70051, 1996 WL 631079 (Ohio Ct. App. Oct. 31, 1996). And in each case the non-breaching employer made significantly more effort than TQL did to substantiate and make concrete its claimed lost profits. In *Try Hours*, for example, the company presented a damages expert who used a methodology that accounted for, in addition to the breaching employee's profits, a "general business rule of thumb of 'approximately 20 percent turnover and 80 percent retainage'" as well as a calculation of "the amount of costs Try Hours would have incurred in generating the additional revenue." *Try Hours, Inc.*, 2007 WL 867106, at *4; *see also Cleveland Cotton Prods*, 1996 WL 631079, at *2 (accounting for similar offsets of employer's overhead, expenses, and commission). TQL's request for the entirety of Daniels' total profit, by contrast, does not even account for the commission that TQL would owe Daniels in the counterfactual in which Daniels secured those loads while still employed for TQL. We cannot fault the district court for finding TQL's proof of damages lacking.

Finally, TQL claims that the district court mistakenly applied the "clear and convincing" standard required for injunctive relief to its claim for money damages. But our examination of the record reveals no error. The district court required a "clear and convincing" showing that the non-compete was reasonable; it did not apply this standard to the question whether TQL had proven damages. *Compare* TQL/EDA, 685 F. Supp. 3d at 575 (party seeking enforcement "must establish reasonableness under [Ohio law] test by clear and convincing evidence"), *with id.* at 578–80 (discussion of money damages); *see also Chi. Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 991 n.3 (6th Cir. 2007).

The district court did not clearly err by declining to award TQL money damages following the bench trial.

B.

TQL next argues that the district court erred by finding that TQL had justified enforcing the parties' non-compete agreement only to the extent that it prevented Daniels from soliciting customers with whom Daniels worked while at TQL. In TQL's view, the district court should have enjoined Daniels from working in the logistics industry at all.

Under Ohio law, a non-compete agreement may be enforced "to the extent necessary to protect an employer's legitimate interests." *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 548 (Ohio 1975). Ohio courts compare the reasonableness of contractual restrictions against an employer's legitimate interests "using three factors." *James B. Oswald Co. v. Neate*, 98 F.4th 666, 673 (6th Cir. 2024). "The agreement must (1) be 'no greater than is required for the protection of the employer,' (2) 'not impose undue hardship on the employee,' and (3) not be 'injurious to the public.'" *Id.* (quoting *Raimonde*, 325 N.E.2d at 547). Courts "keep in mind nine 'fact-specific considerations'" that guide this inquiry.[2] *Id.* (quoting *Union Home Mortg. Corp. v. Cromer*,

---

[2]     "The nine fact-specific considerations are as follows: (1) The absence or presence of limitations as to time and space; (2) whether the employee represents the sole contact with the customer; (3) whether the employee is possessed with confidential information or trade secrets; (4) whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; (5) whether the covenant seeks to stifle the inherent skill and experience of the employee; (6) whether the benefit to the employer is disproportional to the detriment to the employee; (7) whether the covenant operates as a bar to the employee's sole means of support; (8) whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and (9) whether the forbidden employment is merely incidental to the main employment." Some Ohio courts assess the covenant's reasonableness using the three general factors only, but others consider these nine factors. So the nine fact-specific factors help guide the analysis but are not individually necessary.

*James B. Oswald Co.*, 98 F.4th at 673 n.4 (internal citations omitted).

31 F.4th 356, 366 (6th Cir. 2022)). "It is the employer's burden to prove that there is a legitimate business interest to be protected" by a non-compete agreement. *MetroHealth Sys. v. Khandelwal*, 183 N.E.3d 590, 596 (Ohio Ct. App. 2022). It must do so with "clear and convincing evidence." *Id.* at 595.

The district court recognized that employers have a legitimate business interest in protecting confidential information, providing training that gives an employee a valuable skill, and protecting customer goodwill. *TQL/EDA*, 685 F. Supp. 3d at 573–74. It found that TQL substantiated with evidence its interest in protecting customer goodwill and relationships, and that this interest is adequately protected by the agreement's non-solicitation provision. *Id.* at 576. Yet the district court also found that TQL had fallen short of proving by clear and convincing evidence that it had "provided Daniels access to sufficient training or information to support enforcing a nationwide ban on Daniels' participation in the logistics industry." *Id.* at 575. That is because TQL "failed to prove the content or extent of [the] training, show how the material conveyed was proprietary or trade secret, or show how Daniels' access to that information could or did harm TQL in his new employment." *Id.*

The record supports the district court's observations. TQL's witness, Bostwick, admitted that he "lacked direct knowledge of much of the training that Daniels received." *Id.* at 569. TQL's documentary evidence of Daniels' training reflected that many courses lasted for only a few minutes or were not completed. And some of the substance of that training indisputably could be found on YouTube. TQL's failure to prove clearly and convincingly the specific aspects of its training that warranted protection beyond enforcement of the agreement's non-solicitation provision reasonably drove the district court's decision.

TQL's arguments to the contrary are not persuasive. TQL protests that the district court ignored TQL's "legitimate interest in retaining employees in which it invested significant resources and training." Appellant Br. at 34. TQL tells us that the district court imposed a new "proprietary" requirement on a business asserting a legitimate interest in training employees. And it notes that, even if not proprietary or "trade secret," TQL nevertheless spends considerable time and money curating its training.

But it is not clear that the district court actually imposed any "proprietary" requirement for the training. And when setting forth the relevant legal principles, the district court recognized the existence of the very interest that TQL says it ignored—"where an employer pays to provide training that gives an employee a valuable skill," the employer may be justified in preventing competitors from poaching those employees. *TQL/EDA*, 685 F. Supp. 3d at 573. Rather, the district court's analysis "turn[ed] in large part on the evidence that TQL offered." *Id.* at 575. The district court simply found TQL's evidence lacking—a finding that was not clearly erroneous.

We acknowledge, as did the district court, that at least some Ohio courts have been willing to grant TQL's request to enforce industry-wide non-compete restrictions on former TQL employees. *See Total Quality Logistics, LLC v. Leonard* (*TQL/Leonard*), 220 N.E.3d 225, 232–33 (Ohio Ct. App. 2023). Yet Ohio law requires each case evaluating the reasonableness of a non-compete agreement to "be decided on its own facts." *Raimonde*, 325 N.E.2d at 547 (citation omitted). The evidence TQL presented in *TQL/Leonard* is not necessarily what TQL presented at trial in this case. *See TQL/EDA*, 685 F. Supp. 3d at 576 ("The Court does not know what training evidence TQL provided [in *TQL/Leonard*.] But *here*, TQL failed to prove the necessary training.").

On this record, the district court did not clearly err in declining to enjoin Daniels from working in the entire logistics industry.

C.

TQL next contests the district court's conclusion that it failed to prove its trade-secret claim.

Ohio law protects against the misappropriation of trade secrets. *See* Ohio Rev. Code § 1333.61 *et seq.* Under Ohio law, a trade secret is information, including "business information or plans," or a "listing of names, addresses, or telephone numbers," that "derives independent economic value" from not being known or "readily ascertainable by proper means" and that is the subject of reasonable efforts to maintain its secrecy. *Id.* § 1333.61(D)(1)–(2). "[W]hether something is a 'trade secret' and whether it has been 'misappropriated'" are "factual questions" reviewable under the clear-error standard. *James B. Oswald Co.*, 98 F.4th at 675; *see also Fred Siegel Co. v. Arter & Hadden*, 707 N.E.2d 853, 862 (Ohio 1999). TQL asserts two trade secrets: customer and pricing information.

1.

Regarding customer information, the district court agreed that customer lists could, "if organized into a compilation," be trade secrets under Ohio law. *TQL/EDA*, 685 F. Supp. 3d at 577. But TQL did not prove that Daniels took any "customer information database" or compilation with him when he left TQL's employ. *Id.* Though Daniels retained contact information for some customers that he directly serviced, the district court noted that "telephone numbers for a small number of companies are 'readily ascertainable by proper means,'" and "easily discovered as part of the cold-calling process." *Id.* (quoting Ohio Rev. Code § 1333.61(D)(1)).

TQL argues that an ability to cold call potential customers does not prevent customer information from being protectable as a trade secret. And it notes that it has spent considerable time in compiling customer information, "often gathered through trial and error and maneuvering past gatekeepers." Appellant Br. at 46. TQL asserts that its customer list cannot be duplicated by scrolling the internet, and points out that Daniels and EDA did not need to spend any time or resources developing their own customer list.

We are sympathetic to TQL's concerns. After all, Daniels did not need to curate his own customer list; because of the time he spent servicing TQL customers, Daniels was ready to "hit the ground running" upon starting his own, competing business. Trial Tr., R. 31, PageID 1009. And it is true that Ohio law treats customer lists as presumptively entitled to trade-secret protection. *State ex rel. Besser v. Ohio State Univ.*, 732 N.E.2d 373, 380 (Ohio 2000). Yet Ohio limits that protection when the identity of the customers is "readily ascertainable through ordinary business channels." *Salemi v. Cleveland Metroparks*, 49 N.E.3d 1296, 1302 (Ohio 2016) (citation omitted). In that circumstance, to be a protectable trade secret under Ohio law, a customer list "*must* contain information not generally known to or readily ascertainable by the public." *Id.* (emphasis added). Ohio courts have applied this principle in declining to recognize a protectable trade secret in customer-contact information that a departing employee retained in a cell phone. *See Kross Acquisition Co., LLC v. Groundworks Ohio LLC*, 236 N.E.3d 453, 459-60 (Ohio Ct. App. 2024). The "limited nature of the customer contact information"—as compared to the "master customer list" that the employer maintained (and that the employee did not download or take)—meant that the information retained in the cell phone could not support a trade-secret claim. *Id.* at 459.

The district court applied these principles to the case at hand. It heard testimony that TQL employees developed customer contacts via trial-and-error and cold-calling. And, setting aside the contact information for customers with whom Daniels previously worked, TQL offered no proof that Daniels retained access to, or information from, TQL's customer-information database or "Load Manager" system when he left the company. In short, the district court's account of the evidence finds ample support in the record and Ohio trade-secret law.

TQL responds primarily with a district court case arising in a preliminary posture. In *MP TotalCare Services, Inc. v. Mattimoe*, the district court determined that an employer's customer list could be protectable as a trade secret under Ohio law because recreating "such a list would require a large investment of time and resources." 648 F. Supp. 2d 956, 966 (N.D. Ohio 2009). It did so, however, in the context of denying a motion for summary judgment, ultimately concluding that "a jury could find" that the employer's customer list was a trade secret. *Id.* Here, by contrast, the district court issued its decision after hearing TQL's evidence presented at a bench trial. And the district court's decision sits comfortably with Ohio cases presenting similar claims, like *Kross Acquisition*. *See* 236 N.E.3d at 459.

The district court did not clearly err in finding for Daniels on this claim.

2.

TQL also contends that Daniels misappropriated its "pricing information." The district court concluded that pricing information in the logistics industry is "volatile" and has a "short shelf-life, if any, as a trade secret." *TQL/EDA*, 685 F. Supp. 3d at 577. The district court asserted that, "to the extent that Daniels learned the margin TQL normally tacks on, the testimony showed logistics is a price-sensitive industry. Customer calls often included TQL employees engaging in price discovery efforts to see what price the market, or at least that specific customer, would bear."

*Id.* So, the court determined, much of TQL's pricing information, like customer information, "could have been learned by legitimate means (during the sale process)." *Id.*

TQL argues that price volatility is no bar to finding a trade secret, and that its pricing strategies derive independent economic value from being secret. TQL asserts that Daniels had a competitive edge from knowing TQL's pricing and margins, which allowed him to win bids.

TQL is right that pricing policies can rise to the level of a protectable trade secret under Ohio law. *E.g.*, *Poseidon Env't Servs., Inc. v. Nu Way Indus. Waste Mgmt., LLC*, 102 N.E.3d 1145, 1156 (Ohio Ct. App. 2017); *Litig. Mgt., Inc. v. Bourgeois*, No. 95730, 2011 WL 2270553, at *3 (Ohio Ct. App. June 9, 2011). Moreover, unlike a general market price determinable by price discovery, we recognize that TQL's margin expectations or pricing strategies might not be "readily ascertainable by proper means." Ohio Rev. Code § 1333.61(D)(1). A competing former employee, privy to his former employer's pricing strategies or margin expectations per job, might be able to outbid his former employer on future jobs.

Yet TQL failed to articulate precisely what concrete "pricing information" it thinks Daniels misappropriated. The record is unclear whether TQL had any standard route pricing or margin expectation that Daniels could have misused. And, critically, TQL's witness explained that LAEs had wide discretion in setting price—even to the point of opting to break even or lose money on individual bids, presumably to build a customer relationship. TQL provided no information about whether it restricted that discretion in any regular or standardized way. *See Poseidon Env't Servs.*, 102 N.E.3d at 1156 (considering trial testimony in which former-employer plaintiff explained how it taught a former employee its job-bidding process and price quote formulas). And it offered no evidence of any concrete policy or practice regarding the margins it considered acceptable. On this record, we cannot conclude that the district court clearly erred in finding for Daniels on this claim.

D.

Finally, we take up TQL's contention that the district court improperly failed to award TQL its attorneys' fees. There is no dispute that the parties' contract allows TQL to recover costs, expenses, and reasonable attorneys' fees. But the fee-recovery provision was unilateral, allowing only TQL to recover fees. The district court found this provision unenforceable under Ohio law because it resulted from a "contract of adhesion," in which Daniels had little or no bargaining power and no realistic choice as to terms. *TQL/EDA*, 685 F. Supp. 3d at 581–83.

TQL responds primarily that unilateral fee-shifting provisions are unenforceable only upon a showing of duress—a narrower standard than a showing of "unequal bargaining power." [Appellant Br. at 55.] But the district court's application of Ohio law and Sixth Circuit precedent was sound; unenforceability under Ohio law is not limited to instances of duress.

Start with *Wilborn v. Bank One Corp.*, 906 N.E.2d 396 (Ohio 2009). That case involved a residential-mortgage contract with a one-sided attorneys' fee provision, requiring a borrower to pay a lender's fees as a condition of reinstating the borrower's defaulted mortgage. *Id.* at 399. The Ohio Supreme Court explained that "agreements to pay attorney fees in a 'contract of adhesion, where the party with little or no bargaining power has no realistic choice as to terms,' are not enforceable." *Id.* at 401 (citation omitted). In that case, however, the court determined that the parties' bargaining power was not unequal because the mortgage documents were form contracts created by sophisticated parties acting as proxies for consumers and lenders. *Id.* at 403. This court later considered *Wilborn*'s effect on Ohio law. In *Allied Industrial Scrap, Inc. v. OmniSource Corp.*, we remarked that "*Wilborn* makes it clear that when not confronted with a direct statutory conflict, Ohio law will generally give effect to [unilateral] fee-shifting provisions when there is no duress." 776 F.3d 452, 453 (6th Cir. 2015).

TQL seizes on our use of the word "duress" to argue that a party seeking to avoid a unilateral fee-shifting provision must show "unequal bargaining power *and* indicia of compulsion or duress." Reply Br. at 28; *see also id.* at 30 ("[The district court] should have assessed whether Daniels was under duress *in addition to* lacking equivalent bargaining power."). TQL's reading of *Allied Industrial* is not persuasive. Context matters, and "the language of an opinion" should not "be parsed as though" "dealing with [the] language of a statute." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979). *Allied Industrial* did not, and could not, limit the Ohio Supreme Court's unenforceability standard from *Wilborn*. *Wilborn* focused on the parties' relative bargaining power and whether the contract is adhesive, though *also* implied that duress could foreclose enforcement. *See Wilborn*, 906 N.E.2d at 400 ("The presence of equal bargaining power and the lack of indicia of compulsion or duress are characteristics of agreements that are entered into freely.").

This framework also accords with later Ohio cases addressing unilateral fee-shifting provisions. For example, the district court relied heavily on *Professional Solutions Insurance Co. v. Novak*, a recent decision from the Court of Appeals of Ohio. There, Novak and his professional malpractice insurance carrier had a dispute about an underlying legal malpractice lawsuit. No. 108839, 2020 WL 5949853, at *1 (Ohio Ct. App. Oct. 8, 2020). The court held that a unilateral fee-shifting provision in the parties' contract was unenforceable; it was offered on a "take it or leave it" basis, was the "product of unequal bargaining power," and was "not freely negotiated." *Id.* at *5. Other Ohio cases are of a piece. *See 2-J Supply, Inc. v. Garrett & Parker, L.L.C.*, No. 13CA29, 2015 WL 4113330, at *1 (Ohio Ct. App. July 1, 2015) (unilateral fee-shifting provision enforceable because there was "no evidence that the attorney fee provisions in the parties' contract were ambiguous, the product of compulsion or duress, or [of] unequal bargaining power");

*Clean Wood Recycling, Inc. v. Tony's Landscaping, Inc.*, No. L-14-1074, 2014 WL 6679181, at *3 (Ohio Ct. App. Nov. 26, 2014) (similar).

TQL also argues in reply that Ohio courts apply a separate set of factors "used to assess procedural unconscionability to determine whether a contract is one of adhesion." Reply Br. at 29. Thus, unequal bargaining power alone, TQL asserts, is insufficient. This court seldom considers arguments not presented to the district court, let alone that are raised for the first time in a reply brief. *McGee v. Armstrong*, 941 F.3d 859, 867 n.11 (6th Cir. 2019); *United States v. Galaviz*, 645 F.3d 347, 362 (6th Cir. 2011). In any event, neither *Wilborn* nor *Novak* analyzed whether the at-issue contracts were separately procedurally unconscionable; instead, each case considered, at length, the respective bargaining positions of the parties. *Wilborn*, 906 N.E.2d at 403; *Novak*, 2020 WL 5949853, at *5–6.

Applying this framework, the district court found that Daniels "did not have any meaningful opportunity to negotiate the employment agreement." *TQL/EDA*, 685 F. Supp. 3d at 582. It noted that TQL's witness "could not identify a single occasion on which TQL had accepted any change to any term in its standard employment agreement." *Id.* And the court found that the parties had unequal bargaining power because Daniels "had no experience at all in the logistics industry," whereas "TQL is a large company that employs scores of LAEs and LAE trainees." *Id.* These factual findings are supported by the record and are not clearly erroneous. The district court drew a reasonable analogy between the facts of this case and those present in *Novak*, concluding that the fee-shifting provision is unenforceable under Ohio law.

TQL responds that the employment context is different; it recruited Daniels, and so he had an opportunity to negotiate terms. It points to *Hilb, Rogal & Hamilton Agency of Dayton, Inc. v. Reynolds*, a case in which an Ohio court affirmed a fee-shifting provision in an employment

contract, noting that a "disparity in bargaining power is inherent in the [employment] relationship" and therefore is insufficient to "render a contract unenforceable absent a showing of duress, misrepresentation, fraud, illegality, or other improper action." *See* 610 N.E.2d 1102, 1107 (Ohio Ct. App. 1992). But the district court persuasively distinguished *Hilb*, noting both that it precedes the Ohio Supreme Court's decision in *Wilborn* by nearly 17 years and that the parties in *Hilb* did not specifically raise the "troublesome issue" that the fee-shifting provision there was unilateral. *TQL/EDA*, 685 F. Supp. 3d at 582 (quoting *Hilb*, 610 N.E.2d at 1109 (Fain, J., concurring)). Setting aside *Hilb*, TQL points to only one contemporaneous Ohio case in support of its arguments: *TQL/Leonard*. The district court's reason for discounting *TQL/Leonard* is persuasive—the court there enforced the provision by its plain terms without analyzing the respective bargaining positions of the parties or whether the provision is enforceable under Ohio law. *See TQL/Leonard*, 220 N.E.3d at 237; *TQL/EDA*, 685 F. Supp. 3d at 582. Indeed, it appears that the parties in *TQL/Leonard* never asked the court to consider the question. *See* Appellant Total Quality Logistics, LLC's Merit Brief at 18, *TQL/Leonard*, 220 N.E.3d 225 (Ohio Ct. App. 2023) (No. CA2022-09-048), 2022 WL 20686580; Brief of Appellees at 13, *TQL/Leonard*, 220 N.E.3d 225 (Ohio Ct. App. 2023) (No. CA2022-09-048), 2022 WL 20686597.

Finally, TQL distinguishes the cases on which the district court relied as dealing with the enforceability of unilateral agreements against a "passive," defaulting party rather than an actively breaching party. But TQL does not explain why this distinction makes a difference. Just as TQL argues that Daniels "invited the accrual of attorneys' fees by affirmatively" breaching the contract, Appellant Br. at 56, the same could be said about Novak, who affirmatively breached his contract by refusing to pay a deductible under the insurance policy, *Novak*, 2020 WL 5949853, at *2. The district court did not clearly err in declining to award TQL attorneys' fees.

\* \* \*

We AFFIRM.